McFarland, J.
This action was brought by Abraham Klauber and eighteen other plaintiffs against T. J. Higgins and a very large number of other defendants, including the city of San Diego, and the board of harbor commissioners for the bay of San Diego. In the complaint it is averred that the plaintiffs now are, and for a long time hitherto have been, " the owners seised in fee and lawfully entitled to' the possession” of certain lands specifically described as lands embraced by eight different state tide land surveys adjoining each other. The lands thus described lie between low and high tide in the bay of San Diego, adjoining lands embraced in the territory over which extends the municipal government of the city of San Diego. It is averred “ that the defendants above named, while the plaintiffs were so seised and possessed of said lands and premises, and entitled to possession thereof, did, to wit, on the ■—— day of-, 1890, without right or title, enter into and upon the same, and unlawfully took possession thereof, and still unlawfully withhold possession of the same from these plaintiffs, and said defendants claim an estate or interest in the above-described property adverse to the title of said plaintiffs.” It is further averred, as to each and all of the defendants, that their claim is without any right, and that they have no title or inter *457 est in said lands, or any part thereof, or any right to the possession of the same. The prayer is that it be decreed “that the defendants have not, nor has either of them, any estate or interest whatever in or to said lands or premises, and that the title of the said plaintiffs thereto is good and valid, and that plaintiffs have a writ for the possession of the premises aforesaid against the defendants herein,” and that defendants be debarred, etc., from setting up any claim to said premises. The defendants, with the exception of a few who disclaimed, answered, denying that plaintiffs, or either of them, had any right, title, or interest in or to said premises, and setting up title or right of possession in themselves. The court found that none of the plaintiffs were seised of said lands, or entitled to possession thereof, and that the defendants did not at any time enter upon the same without right or title, or unlawfully take possession thereof, or that they unlawfully withhold the same from plaintiffs; and judgment was entered accordingly for defendants. From this judgment, and from an order denying a motion for a new trial, plaintiffs appeal.
The premises in controversy are tide lands over which the waters of the bay of San Diego ebb and flow, and the appellants claim title thereto upon applications for their purchase under a general law of the state, approved March 28, 1868 (Stats. 1867-68, p. 507), entitled “An act to provide for the management and sale of the lands belonging to the state,” which act, commencing at section 22 thereof, provides for the sale of “the swamp and overflowed salt marsh and tide lands belonging to the state,” and upon patents afterward issued upon said applications.
A large part of the arguments of counsel on both sides is directed to the question whether or not the legislature of the state had any power at all to provide for the sale of and to convey title to lands of the character involved in this action; but, under the views which we take of the case, it is not necessary to consider that *458 question, because, in our opinion, the particular lands here involved were reserved from the operation of said act of March 28, 1868. If the only question involved here was as to the character of the lands in question, it would no doubt be true under former decisions, that the officers of the land department of the state, by receiving the applications and issuing patents thereon, had determined that the character of the lands was such as described in the act, and that their determination of that question could not be collaterally impeached. (See Gale v. Best, 78 Cal. 235; 12 Am. St. Rep. 44, and the cases there cited.) That is to say: <jIf a large body of public lands be subjected to sale or other disposition under a law which has merely a general reservation of such parts of those lands as may be found to be of a particular character—such as swamp or mineral—then the land department has jurisdiction to determine the character of any part thereof, and a patent is conclusive evidence that such jurisdiction has been exercised.” But if there be no law for the sale of certain lands, no matter what their character be, then a sale of such lands by the officers of the land department of the government is without authority and void. As we said in Gale v. Best, supra: “Of course, if the patent be void upon its face, or if, looking beyond the patent for a law upon which it is based, it is found that there is no law which authorizes such a patent under any state of facts, or that the particular tract named in the patent has been absolutely reserved from disposal, then the patent will be worthless and assailable from any quarter. For instance, if a certain section or a certain township described by legal subdivisions should be expressly and unconditionally reserved by Congress from disposal under any other statute, a patent for any part of such tract would be void.” (See Steel v. St. Louis etc. Co., 106 U. S. 452, 453.) This principle, applied in numerous decisions of the supreme court of the United States to the public lands of the general government is equally applicable to lands of the state. If, therefore, the land in contest in the *459 case at bar was reserved from sale by the said act of the legislature under which appellants claim, the officers of the government had no ¿right to sell the same, and any attempt on their part to do so was void. And we think that said land was clearly so reserved. The applications under which appellants claim were not approved until November, 1871, and no payments were made by the applicants prior to that time. They therefore had made no contract with the state, and had no vested rights until that time. But before that time, to wit, on April 4,1870, the legislature amended section 70 of said act so as to read as follows:
“All the swamp and overflowed, salt marsh and tide lands within one mile of the state prison at San Quentin, within five miles of the city and county of San Francisco, within five miles of the corporate limits of the city of Oakland, and within two miles of any town or village, are hereby excluded from the provisions of this act.” Appellants contend that this provision does not apply in the present instance, because San Diego is a city, and therefore not a town or village; but this position is not tenable. In the first place, it is doubtful whether at the time the applications were approved San Diego was in any sense a city. It seems to have been incorporated as the city of San Diego by an act passed March 27, 1850, entitled “ An act to incorporate the city of San Diego” (Stats. 1850, p. 121); but that act was repealed by an act approved January 30, 1852, entitled an act “to repeal the charter of the city of San Diego, and create a board of trustees.” And by that act a board of trustees was created and given certain rights and powers, among which was the power to pay off the debts of the city whose charter was repealed; there is nothing said in the repealing act about any "city”; and afterward, by an act approved April 16, 1852, entitled an act “for the relief of the indigent sick,” it is provided that “ the trustees of the town of San Diego” are given certain powers, which act must have gone upon the theory that there was no longer any city of San Diego, but that *460 the same was a town. In other acts of the legislature it was called a city, so that it was recognized by the state both as a “ town” and a “city.” But upon general principles the word “town,” as used in said section 70 of the amendatory act of 1868, clearly includes a city. The word “town” is used to designate either a place where there are a number of adjacent occupied dwellings, or as a municipal corporation organized under various statutes of different states, but in either sense it includes a city unless used in some connection which shows that a different meaning was intended. And it would be absurd to say that the legislature intended to withhold the sale of tide lands in front of a place where a considerable number of persons had settled in such a way as to constitute what we mean in common parlance by a village or town, only in the event that the place was not called a city, or had not been organized under a statute providing for the organization of a municipal corporation to be called a city. Certainly the clear purpose of the legislature would include such a place, however named, or however municipally incorporated. This view is amply supported by authority. Blackstone says: “The word ‘town,’ or ‘vill,’ is indeed by the alteration of times and language now become a generical term comprehending under it the various species of cities, boroughs, and common towns. A city is a town incorporated.” (1 Blackstone’s Commentaries, 114.) Burrill defines “town” as follows: “A collection of houses in one neighborhood; a generical term comprehending under it the several species of cities, boroughs, and towns.” In Board of Commrs. v. McGurrin, 6 Daly, 349, the question was whether a certain act touching the suppression of intemperance, etc., which referred in terms only to overseers of a “town,” applied to the city of New York, and it was held that it did. The court said: “It does not follow that because this amendment designates overseers of the town where the penalty was incurred, that cities were not intended to be included. ‘Every borough or city/ says Tomlins, ‘is a town.’ The greater *461 nececna.'^y includes the less, for a city begins as a village, extends into a town, and afterward becomes a city by incorporation or otherwise; for there are cities that were never incorporated.” The court, after referring to Blackstone, says further: “In common parlance the word is frequently applied to cities, as ‘leaving town,’ ‘come into town/ ‘out of town/ etc. We have in this state the political division of towns, cities, and incorporated villages, and that that particular political division is what is meant by the word ‘town’ may in a given case be apparent from the purpose of the statute. But that is not the case here. This was an amendment of a section of a statute applying to the whole state.” In New Jersey the constitution of the state was amended so as to provide that the legislature should not pass private, local, or special laws “regulating the internal affairs of toWns and counties”; and in State v. Parsons, 40 N. J. L. 1, it was contended that cities were not embraced in the expression “towns and counties” in said amendment. But the court held otherwise, and, among other things, said: “The contention is that the word ‘towns’ does not embrace ‘cities.’ But this argument is founded on the false basis of looking only at the letter of the law and turning away from the spirit. It is true that if the letter of the law -were absolutely unambiguous and definite, and. were susceptible of but a single meaning, the clause would have to be read in such sense, no matter to what futility it might lead. But this is not the case; the word ‘town’ has no such fixed signification as this, for, though in its narrower sense it denotes something other than a city, in its broader scope it comprehends such a municipality. Mr. Tomlins in his law dictionary, under the title ‘Town/ says: ‘Under the name of the town or village, boroughs, and it is said cities, are contained, for every borough or city is a town.’ Lord Coke in 1 Institutes, 116, showing the capaciousness of the term, has this language: ‘And it appearetli by Littleton that a town is the genus and a borough is the species.’ Bouvier’s definition of the *462 word ‘city’ is ‘a town incorporated by that name.’ ” Afterward, having reference to certain other matters, the court further said: “But this uncertainty obtains only so long as we yield our minds to the rigor of verbal definitions; for when once we emancipate ourselves from such bondage, and look at the purpose of the law, all doubts are at an end. When we find that the adoption of the narrow signification of the term used will lead to positive absurdity, and that the reception of the word in its wider import is attended with the establishment of a rule of public policy both wise and salutary, it is not difficult to make choice between the alternatives.” In Odegaard v. Albert Lea, 33 Minn. 351, the question was whether said city was required by law to care for its poor under an act wdiich referred in terms to “towns” only, and did not mention cities eo nomine; and the court held that the act did apply to cities. The court in its opinion, among other things, said: “The city or village bears substantially the same relation to the state government and has substantially the same functions of local government as the town. Indeed, a city is but an incorporated town, with such special powers and special mode of government as the circumstances require.....The word ‘town’ is often used as generic term embracing all such primary municipal corporation's as incorporated cities and villages, and, independently of any statutory provision, it has become a well-settled rule of construction that the term ‘town’ when used in a general statute, may include cities, unless the contrary appears from the whole statute to have been the intention of the legislature. (1 Blackstone’s Commentaries, 114; Road in Milton, 40 Pa. St. 300; Board of Commrs. v. McGurrin, 6 Daly, 349; Peck v. Weddell, 17 Ohio St. 271; State v. Glennon, 3 R. I. 276; Flinn v. State, 24 Ind. 286; Abbott’s Law Dictionary, ‘Town.’) ” The foregoing authorities are clearly to the point that in the statute now here under review the word “town” embraces city. And under this view the territory within which the' land described in the *463 complaint is situated was reserved from sale, and the officers of the land department of the state had no authority to sell it, no matter what they may have deemed the character of the land—as whether tide lands or not —was. Therefore, there being no law for the sale of said land, its attempted sale and the patents intended to perfect said sale are void.
Appellants contend that, although their title to the lands in question may have been invalid under said act of 1868, yet that their title was confirmed and perfected by the act of the. legislature, approved May 27, 1872. (Stats. 1871-72, p. 622.) That act is entitled “An act to legalize applications heretofore made for the purchase of lands belonging to this state, and to confirm the title of the purchasers under such applications.” The first section reads as follows: “All applications heretofore made for the purchase of lands belonging to this state under the provisions of any act authorizing the sale of state lands shall be good and valid, although the land described in such application and affidavit may be styled salt marsh and tide lands, when in fact it is swamp and overflowed land; or may be styled swamp and overflowed land, when in fact it is salt marsh and tide lands; or may be styled swamp and overflowed and salt marsh and tide land when in fact it may be either.” Section 2 provides that “in all cases where patents have been or may hereafter be issued upon any such applications or affidavits as described in section 1 of this act for any such land, the same shall be deemed and held to convey the legal title to the land in such patent or patents described to the purchaser therein mentioned by whatever style such land may be designated in such patent.” The purpose of this act was clearly simply to legalize applications for lands which were subject to sale under some law of the state, where such applications were defective in manner as described in the act, namely, where the land had been designated in the application as swamp and overflowed land, when in fact it ought to have been described as salt marsh and tide *464 land, or vice versa. The language of this court in Rooker v. Johnston, 49 Cal. 3, in which the act of March 24, 1870 (Stats. 1869-70, p. 352), entitled “An act to legalize certain applications for the purchase of lands belonging to this state,” was construed, is applicable to the construction of the act now under review. The court, there said: “ The act, as we construe it, deals with the applications alone, and does not intend or have the effect to offer for sale lands which were not subject to sale under the general law. It is not the purpose of the act to declare that an application for the purchase of land which had not been offered for sale when the application was filed should be good and valid, and that the applicant might proceed with and complete his purchase; but the intent was to make the application as valid as it would have been had it been free from all defects, had it contained within itself all that the statute required it to contain.” And so in the case at bar, the said confirmatory act of 1872, was merely intended to validate applications for lands subject to sale which were defective, and not intended to apply to lands that were reserved from sale under the general law. This view renders it unnecessary to consider the contention of respondents that on the same day on which said confirmatory act was passed another act was passed, entitled “ An act for the relief of purchasers of state land” (Stats. 1871-72, p. 578), in which it was provided that the act should not apply to any lands within the county of San Diego, and that the two must be construed together, and thus construed exempts the county of San Diego from the operation of either.
There is nothing in the position of appellants that respondents are not in a position to attack the patents under which appellants claim. It is averred in the complaint that the respondents were in possession of the land described in the complaint at the commencement of the action; and, one in possession of land is always in a position to contest the right of another claiming under a void patent. (Cucamunga Fruit Co. v. *465 Moir, 83 Cal. 101; United Land Assn. v. Knight, 85 Cal. 448; Edwards v. Rolley, 96 Cal. 408; 31 Am. St. Rep. 234.) In Steele v. St. Louis etc. Co., supra, the United States supreme court, after having said that i-n certain cases a patent was conclusive, uses this language: “ It need hardly be said that we are here speaking of a patent issued in a case where the'land department had jurisdiction to act, the lands forming part of the public domain, and the law having provided for their sale. If they never were the property of the United States, or if no legislation authorized their sale, or if they had previously been disposed of or reserved from sale, the patent would be inoperative to pass the title, and objection to it could be taken on these grounds at any time and in any form of action.” Moreover, some of the respondents, as, for instance, the board of harbor commissioners for the bay of San Diego, do connect themselves directly with the right of the state to said lands.
The judgment and order appealed from are affirmed.
Van Fleet, J., Garoutte, J., Temple, J., Harrison, J., Henshaw, J., and Beatty, C. J., concurred.