## UNITED STATES v. PRIMROSE COAL CO.

(District Court, D. Colorado.    April, 1914.)

### No. 5655.

1. PUBLIC LANDS (§ 120*)—SUIT FOR CANCELLATION OF PATENTS—EVIDENCE CONSIDERED.

In a suit by the United States for the cancellation of patents to public land issued under Timber and Stone Act June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545], on the ground that when the entrymen made application to purchase they knew the lands were coal lands and chiefly valuable as such, and fraudulently made the applications and supported the same by false affidavits, it was shown that as to two of the three entries a coal filing was made in opposition and treated as a contest; that when the entrymen made their proofs the government by direction of the Commissioner of the General Land Office was represented by counsel, who cross-examined the applicants and their witnesses, and examined other witnesses as to the character of the land; that as to all the entries successive coal filings had previously been made on the land and abandoned; that after the proofs were taken a special agent was sent to personally examine the land, and on his report that it was chiefly valuable for timber the patents were issued. *Held*, that such evidence was insufficient to sustain the allegations of the bill, although several years later it was found that there was coal on the land, perhaps in paying quantities.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332-335; Dec. Dig. § 120.*]

2. PUBLIC LANDS (§ 106*)—VALIDITY OF PATENTS—CONCLUSIVENESS OF FINDINGS OF EXECUTIVE DEPARTMENT.

Where the Land Department after full investigation has determined that land sought to be acquired under the Timber and Stone Act was subject to entry thereunder, and accepted the applications and issued patents therefor, such findings of fact are conclusive and the decision of the department final.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 104, 301, 302; Dec. Dig. § 106.*]

Suit by the United States against the Primrose Coal Company. Decree for defendant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Frank Hall, Sp. Asst. Atty. Gen., for the United States.

P. J. Dugan and Miles Saunders, both of Pueblo, Colo., for defendant.

LEWIS, District Judge. [1] This is a suit to cancel three patents issued to three separate entrymen on the ground, as claimed, that all of the lands were known coal lands when entered but were unlawfully acquired under the Timber and Stone Act. The entrymen were Guy T. Nash, Hosea B. King and Anna Lillie. The basis of the suit, shortly stated, is that each of the entrymen knew at the time of their respective applications to purchase that the lands were coal lands and chiefly valuable as such; that with this knowledge they each fraudulently made application to purchase under the Timber and Stone Act; that they made false affidavits themselves and procured the two supporting witnesses as to each entry to likewise make false affidavits as to the character of the lands; that they did not make their entries for their own use and benefit but for the use and benefit of the defendant herein, and that there was a conspiracy between the defendant and the entrymen, and others, to thus fraudulently acquire from the government coal lands known by the entrymen and the defendant to be such, and that the purpose of the conspiracy was accomplished by an imposition upon, and a deception of, the land officials in this manner.

Guy T. Nash made his application to purchase the 160 acres in his entry on April 8, 1899, and Hosea B. King made his application on the same day. June 20th of that year was fixed by the register as the day on which proof should be offered by the applicants for the purpose of showing that the lands sought were more valuable for timber or stone than other purposes. Before the day arrived for submitting proofs one John James filed a coal declaratory statement in which he claimed the right to enter a part of the lands in the Nash and King entries as coal lands, and on June 19th, the day before the time set for taking proofs in the Nash and King entries, the Commissioner of the General Land Office wired the register and receiver as follows:

"Do not issue final certificates on timber land applications of Guy T. Nash and Hosea B. King. Notify Hendershot when proofs are taken."

Hendershot was one of the field agents in the Land Department. About a dozen coal filings had theretofore been made on the Nash tract by entrymen and each abandoned, and one had been made on the King tract theretofore and abandoned. On June 20th, the day set for the proofs, Nash and King each appeared with their supporting witnesses, and each claimant and his witnesses made the required affidavits which were filed with the register, and thereupon each applicant and his two supporting witnesses and two other witnesses, to wit, W. S. Bayles and Joseph Ray, were subjected to oral examinations as to the character of the lands in the two entries, Mr. Dugan appearing as counsel for the applicants and Mr. Hendershot as counsel for the government. Copies of the record of this testimony were introduced in evidence, and they disclose that each witness was examined and cross-examined at length as to the character of the lands in each entry, both as to indications of probable coal deposits therein as well as to their value for the timber

thereon. These examinations extended into the next day. The coal filing of James was treated as a contest against the King and Nash entries. These entries remained in suspense and the government had its special agent Hendershot, and also its special agent O'Brien, make personal examinations of the two tracts and transmit their reports thereon to the Commissioner. Each of these agents reported that he had made a personal examination of each tract and had found that there were no indications of coal upon the lands and that they were most valuable for the timber. Hendershot had theretofore reported that the lands were coal in character, but he made a second examination, and in his latter report he said that he had been misled in his first report for the reason that he was not at first correctly informed as to the lines and corners of the tracts. The Commissioner by letter of June 5th, 1901, advised the register and receiver of the contents of the reports made by Hendershot and O'Brien, and in his letter said:

"In view of the facts being as stated in the said reports, above referred to, it would appear that the said application for the above tract was a bona fide application for the timber and stone thereon and not for the alleged coal, that is not shown to be on the said tract."

The Commissioner transmitted with his letter the final proofs that had been offered by the applicants and directed the register and receiver to take action on the merits of the entries.

The register and receiver, acting on the direction so given by the Commissioner, issued final certificates to Nash and King on their entries in June, 1901.

In July, 1901, Nash conveyed the lands in his entry to the defendant coal company in consideration of shares of its stock of value, according to the proof, of about $1,250.00, and in September, 1901, King for like consideration conveyed the lands in his entry to the defendant company. The patents for these two tracts each bears date April 5, 1905. At the time of these conveyances King and Nash were both members of the board of directors of the defendant, and one or both were officers of that company.

2. Anna Lillie made her application to purchase 160 acres, under the Timber and Stone Act, on May 25, 1901. The register fixed August 23rd following as the day on which to offer proof to show that the land was more valuable for its timber or stone than for other purposes. On that day she appeared and filed her required affidavit called "Testimony of Claimant." She was also subjected to what purports to be an oral cross examination, copy of which was introduced at the final hearing. Her supporting witnesses, whose affidavits were taken at that time, were James Lillie and George H. Kennedy, and in addition to their required formal affidavits they were likewise subjected to oral examination. Kennedy testified that he was at that time in the employ of the defendant company which had a mine about a mile and a half from the Lillie tract. Each witness was examined fully as to the character of the land, both as to coal indications and its value for the timber on it. Receiver's receipt was not issued to Anna Lillie for her tract until August, 1904, and her patent bears date February 10th, 1905.

From a certified copy of a letter from the Commissioner it appears

that after the final proof was taken in the Lillie entry the receipt and certificate were withheld pending an investigation by a special agent of the office of the Commissioner. The record at the local office had been transmitted to the Commissioner of the General Land Office and was there considered in connection with the agent's report. Excerpts from the report of the special agent found in this letter, among other things, contain this:

"Said lands are chiefly valuable for the timber thereon." "It is further stated that the claimant, who is a colored woman, resides in Pueblo, Colorado, and has so resided for many years. She has the reputation of saving her earnings and it is believed she has the necessary money as a result of her own accumulations wherewith to pay for said lands. The special agent further states that after a due and diligent search he is unable to find any contract of sale involving the title to said land; that there is no evidence whatsoever that the entry was made for the use and benefit, in whole or in part, of any other person, firm or corporation, or that the same has not been made in entirely good faith. Special agent recommends that the application be passed to entry and subsequently to patent." "After a careful consideration of the entire record and the agent's report, his recommendations are concurred in."

After the final certificate was issued on this entry Anna Lillie conveyed the land to Guy T. Nash for a consideration of $500.00 which the proof shows was paid to her, and some two years later Nash conveyed the lands in this entry to the defendant coal company for a stock consideration.

3. There is no proof that the moneys paid for the lands by each of the three entrymen were not respectively their moneys, but on the contrary there is some proof that each entryman paid his own money for his tract. Neither is there any testimony whatever tending to show that the defendant coal company had anything to do, directly or indirectly, with any of these entries at the time they were made or at any time until its purchases from the respective entrymen.

If we were to look at the situation surrounding these lands, especially the Nash and King entries, at the time of the trial of this case and for a few years theretofore, a rational conclusion from the proof would be that they are chiefly valuable for the supposed deposits of coal therein. They are within what is now generally known as a well-defined coal field. Coal mines have been opened on lands adjoining the Nash and King entries and show deposits of some coal in those entries; but the situation in that respect is vastly different from what it was more than 13 or 15 years ago when these entries were made.

In addition to the coal filings on the King and Nash tracts, which had been abandoned as above noted, there had also been coal filings on the Lillie tract and they were abandoned. At the time of each of these entries there was, to say the least, great uncertainty in the minds of those who were familiar with these lands as to whether or not there was coal upon them. With this condition in mind there may be a basis for a suspicion that each of these entrymen indulged a hope, at the time of their respective entries, that coal might some day be found, but this is far from finding in the record any substantial proof that each of the entrymen knew at the time they made their application to purchase under the Timber and Stone Act that the lands were chiefly valuable for

their coal deposits and were known by them to be coal lands, and that thus they each perpetrated a fraud upon the government. Neither the act under which the entries were made, nor the coal land act contemplates such fortuitousness. The Timber and Stone Act only requires in this respect that no valuable deposit of gold, silver, cinnabar, copper or *coal* exists on the land "as deponent verily believes." And the following section of that act (section 3) does not contemplate that the applicant shall assure the known character of the land, but that he shall only present "satisfactory evidence" that the land is of the character which it is claimed to be.

The fraudulent character of these entries, upon the part of the entrymen as charged in the bill, is not sustained by the proof.

[2] 4. But aside from what has been said, and conceding, for present purposes, that the lands were believed by the entrymen to contain coal deposits, I think the bill must be dismissed for another reason: The proceedings by the Land Department in connection with these entries show beyond any doubt that the question as to whether or not the lands in each entry were coal in character, was directly involved in each entry. In the Nash and King entries that question was specifically presented by the contest of James who sought to have the timber and stone entries of Nash and King cancelled and to acquire the lands himself under the Coal Land Act (Act March 3, 1873, c. 279, 17 Stat. 607). At a hearing of that issue the government was represented by counsel, and witnesses were interrogated specifically as to that fact. The Commissioner then, before acting, had a personal inspection of the lands made by representatives from his office for the purpose of determining whether the lands were coal in character or whether they were chiefly valuable for the timber upon them. On the testimony taken at the hearings on the King and Nash entries, together with the reports of two special agents who personally examined the land, the department reached the conclusion that the lands were properly subject to entry under the Timber and Stone Act. The same proceeding, substantially, was had by the department as to the Lillie entry. The conclusion was also reached that the lands she applied for could be entered under the Timber and Stone Act.

The questions of fact involved here in all of these entries as to whether the lands in each instance were coal in character, were involved in the inquiry by the department while these entries were pending. On that inquiry it was determined as a fact that the lands were not coal in character and could not be entered as such.

"The appropriate officers of the Land Department have been constituted a special tribunal to decide such questions, and their decisions are final to the same extent that those of other judicial or quasi judicial tribunals are." Vance v. Burbank, 101 U. S. 514, 25 L. Ed. 929; U. S. v. Throckmorton, 98 U. S. 66, 25 L. Ed. 93; Steel v. Smelting Co., 106 U. S. 450, 1 Sup. Ct. 389, 27 L. Ed. 226; Baldwin v. Starks, 107 U. S. 465, 2 Sup. Ct. 473, 27 L. Ed. 526; Sanford v. Sanford, 139 U. S. 647, 11 Sup. Ct. 666, 35 L. Ed. 290; Bishop of Nesqually v. Gibbon, 158 U. S. 166, 15 Sup. Ct. 779, 39 L. Ed. 931; Whitcomb v. White, 214 U. S. 15, 16, 29 Sup. Ct. 599, 53 L. Ed. 889.

The bill will be dismissed. It is so ordered.