# UNITED STATES v. CORONADO BEACH COMPANY.

ERROR TO AND APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF CALIFORNIA.

Nos. 524, 525. Argued March 1, 2, 1921.—Decided March 28, 1921.

1. The fifth section of the Mexican Colonization Law of August 18, 1824, which declares the right of the federal government, for the defense or security of the nation, to make use of lands for the purpose of constructing warehouses, arsenals and other public edifices, cannot be construed as reserving a power of expropriation without compensation over land granted under the act to a Mexican citizen. P. 485. *Arguello* v. *United States*, 18 How. 539.

2. The title to tide and submerged lands acquired by the State of California upon her creation was subject to prior Mexican grants, and subject to the jurisdiction of the District Court, under the Private Land Claims Act of March 3, 1851, to determine whether such lands, in any case before it, had been granted by the prior sovereignty. P. 487.

3. A decree of the District Court construing the boundary calls of a grant as including tide and overflowed lands adjacent to the granted upland, and confirming it accordingly, was a valid exercise of the court's jurisdiction, even if the construction was erroneous, and is not subject to collateral attack upon the ground that the Mexican documents, correctly interpreted, confined the grant to the shore line. P. 487.

4. In a suit by the United States to condemn rights deraigned under a Mexican grant, confirmed, surveyed and patented under the Act of March 3, 1851, *supra*, in which the Government claimed that adjacent tide and overflowed lands, included in the survey and patent, were not in the original grant or the confirmatory decree, and did not pass, *held*, that the confirmation and patent were conclusive, and that the Mexican map of the boundaries, which, with the other documents of the grant, was referred to in the decree of the District Court as defining it, was irrelevant. Pp. 487, 488.

5. *Held*, further, that the patent could not be collaterally impeached by showing from the field notes that the line including the tide and

submerged lands was not surveyed; and that, considered as a direct attack, the suit was barred by the limitation Act of March 3, 1891. P. 488.

6. An expert witness to value in a condemnation case used maps and drawings to illustrate his conception of the possible uses of the land. *Held*, that if the plan so portrayed was remote and speculative, the objection went to the weight of his testimony and not to such use of the maps and drawings. P. 488.

7. Under the Act of July 27, 1917, c. 42, 40 Stat. 247, providing for the taking of the "whole of North Island " and for "the determination and appraisement of any rights private parties may have in said island," and under the bill in this case following the act, the Government took not merely the upland but the adjacent tide and overflowed lands as well. P. 489.

274 Fed. Rep. 230, affirmed.

THE cases are stated in the opinion.

*Mr. Assistant Attorney General Garnett,* with whom *Mr. Charles S. Lawrence* was on the briefs, for the United States:

The Mexican Colonization Law of August 18, 1824, by its 5th article, expressly reserved to the federal government the right to make use of any portion of lands within ten leagues of the sea coast, for the purpose of national defense. See Hall's Mexican Laws, §§ 488–502. This applies to all of the national lands to be distributed under this law, and not only to lands to be colonized by foreigners. *Arguello* v. *United States,* 18 How. 539, did not involve this question of the significance of the 5th article.

No good reason can be perceived why the general government should not reserve the right to use lands donated to its citizens equally with those donated to foreigners who colonize them, for the purposes of national security or defense if the emergency should arise. Indeed, when it is considered that the citizens could be granted lands by the act of the governor of the territory alone on the national boundaries or on the sea coast, and without

. any supervision by the central government, there is more reason for applying the provisions of the 5th article to the lands of citizens than to those donated to foreigners for colonization purposes, the latter being forbidden to settle within twenty leagues of the national boundaries or ten leagues of the sea coast without the approval of the supreme general executive power. The practical interpretation of the section sustains this view. Law of April 6, 1830 (Hall's Mexican Laws, p. 108); Act of the State of Coahuila and Texas, March 25, 1825 (Hall, p. 133); Report of Captain H. W. Halleck, Secretary of State of the Territory of California, March 1, 1849; Rockwell's Spanish and Mexican Law, p. 431 *et seq.;* Jones' Rep., Sen. Doc. No. 18, 31st Cong. 2nd sess., p. 27; *Pueblo of Monterey,* 6 L. D. 179, 182; *Eldridge* v. *Trezevant,* 160 U. S. 452, 463; *Los Angeles Milling Co.* v. *Los Angeles,* 217 U. S. 217.

The United States succeeded to this right, and has not since been divested of it, as to the land here in controversy, either by the confirmation of the grant, *Brown* v. *Brackett,* 21 Wall. 387; *Henshaw* v. *Bissell,* 18 Wall. 255, 264; *Boquillas Cattle Co.* v. *Curtis,* 213 U. S. 339, 344; *Los Angeles Milling Co.* v. *Los Angeles, supra,* 227; or by laches; or by force of the act limiting the time within which suits may be brought to vacate patents.

These tide and submerged lands belong to the State of California as a part of its sovereignty.

The sea and its shores are treated by the Spanish and Mexican laws as *bienes communes,* incapable of private ownership. Moreau & Carleton's Partidas, ed. 1820, vol. 1, tit. 28, pp. 334–7; White's New Recopilacion, ed. 1839, vol. 1, p. 46; vol. 1, Book 2, p. 70; Hall's Mexican Laws, ed. 1885, c. IV, §§ 1463–1471, pp. 446–9.

While it may be that the crown or the congress of Mexico could for the common benefit limit the general rule of the civil law and grant the sea shore for appropriate purposes, *Jover* v. *Insular Government,* 221 U. S. 623, 629, this grant

was under the law of August 18, 1824, for the colonization
of territories of the republic (Hall, p. 147); Regulations of
November 21, 1828, *ib.*, p. 149.

Under these there is no presumption to any power in the
territorial governor of California to grant lands below
ordinary high-water mark. The court must look to these
laws both for the power to grant and for the mode and
manner of its exercise. *Whitney* v. *United States*, 181 U. S.
104, 113; *United States* v. *Cambuston*, 20 How. 59, 63.

The Mexican patent not only does not contain an ex-
press grant of the tide lands or submerged lands, but pro-
vides that any inclosures of the land granted shall not
prejudice any crossings, roads and servitudes which existed
under the Mexican laws.

This would seem to be an express recognition that these
lands on navigable waters were subject to the servitudes
usual in such grants under Mexican laws (see Hall's Mex-
ican Laws, § 1468, p. 448; Moreau & Carleton's Partidas,
ed. 1820, vol. 1, tit. 28, law 6), and negatives any express
grant of title below ordinary high-water mark.

Carrillo's petition described the boundary as on the
"west by the bay and ship anchorage." The order of the
governor directing the issue of patent gives the boundary
as "the land known or named 'Isla' or peninsula, in the
port of San Diego towards the part of—of the anchorage."
The Mexican patent describes the boundary as "west by
the bay or anchorage for ships, as explained by the map
which goes with the espediente."

The petition to the land commissioners shows that the
land had not been surveyed by the surveyor general (which
was only necessary in order that patent might issue on con-
firmed claims under § 13 of the Act of March 3, 1851, 9
Stat. 631), because "such survey from the nature of the
case being unnecessary, the boundaries being natural and
not to be mistaken."

The map filed with the espediente, as set out in the

Mexican patent, is not in the record in this case and seems not to have been produced at the trial. A certified copy thereof from the Land Office is here exhibited, and a copy will also be found in the records of this court in the case of *United States* v. *Simmons,* No. 224, at the December term, 1863. From this map, which the Mexican regulations of 1828 required an applicant for a donation of vacant land to file, it is evident that the shore line on the west is meandered and none of the bay is included, which makes clear that the boundary given in the Mexican patent and in the petition therefor as the "bay or anchorage for ships," or "bay and ship anchorage," is but a description of the navigable body of water which forms the west boundary of the donation. Billings and others who petitioned the land commissioners for a confirmation fully recognized this when they asserted that the boundaries were natural and not to be mistaken, and a survey of the land, in order to segregate it from other land, was unnecessary.

That a Mexican grant bounded by the bay on navigable waters adjacent does not extend over the submerged lands or tide lands below ordinary high-water mark is too well settled for argument. *Shively* v. *Bowlby,* 152 U. S. 1, 29.

When California became a part of the territory of the United States, unless there had been previous to that time an express grant by the Mexican government of lands below ordinary high-water mark, (*Shively* v. *Bowlby, supra,* pp. 13, 47;) such lands were held in trust by the United States for the benefit of the future State. *Weber* v. *Harbor Commissioners,* 18 Wall. 57, 65, 66; *Shively* v. *Bowlby, supra; Knight* v. *United States Land Association,* 142 U. S. 183.

While California was a territory of the United States, although Congress had power to grant for appropriate purposes titles or rights in soil below ordinary high-water mark of tide waters, it has never done so by general laws and has

adopted the policy of leaving the disposition of sovereign rights in navigable waters in the soil under them, to the control of the States when admitted to the Union. *Shively* v. *Bowlby, supra,* pp. 47, 58.

It is settled, moreover, that when California was admitted to the Union September 9, 1850, she acquired absolute property and dominion over the soils under tide water within her jurisdiction. *Shively* v. *Bowlby, supra; Knight* v. *United States Land Association, supra,* p. 183, and cases there cited.

While, therefore, Congress might have expressly granted or confirmed an imperfect Spanish grant of tide lands below ordinary high-water mark while California was a Territory, it had no such power after California became a State. *Goodtitle* v. *Kibbe,* 9 How. 470, 478; *Packer* v. *Bird,* 137 U. S. 661.

In the decree of the District Court confirming the grant, it is adjudged that the title of the claimants "to the lands claimed by them, as set forth and described in their petition . . . is a good and valid title, and that their claim to the said land be, and the same is hereby, confirmed," and the boundary of the land in question is given "and west by the anchorage for ships according to the documents of title and map to which reference is had." No claim was specifically made in the petition for the extension of the grant to lands below high-water mark. On the contrary, the petition alleges that the boundaries of the land were natural, and not to be mistaken, and that a survey thereof is unnecessary.

The question whether the grant embraced lands below high-water mark, therefore, was never presented to the court, and no right to them was ever in the minds of the claimants at the time their petition was rejected by the land commissioners nor at the time it was confirmed by the court. It follows that translation of title to these tide lands can not be based upon this decree because the claim

confirmed in terms does not embrace them. *Packer* v. *Bird*, 137 U. S. 661, 672.

The decree of confirmation is limited to the extent of the claim made and covered and protected nothing beyond. *Brown* v. *Brackett*, 21 Wall. 387. It merely established the validity of the claim as it then existed, it did not change the character of the grant. *Henshaw* v. *Bissell*, 18 Wall. 255, 264.

Even if it purported to cover the submerged lands fronting the uplands covered by the Mexican grant, the special tribunal created by the Act of March 3, 1851, 9 Stat. 631, had no jurisdiction to determine the validity of claims to submerged lands. It is true authority was conferred on this tribunal to determine the acreage of quantity grants and the boundary of definite claims. *United States* v. *Fossatt*, 21 How. 445, 449. But this authority was limited to lands which, in case claims thereto were rejected by the Commission or were not presented within two years from the passage of the act, would then be "deemed, held and considered as a part of the public domain of the United States." This is made apparent when we consider § 13 of the act.

The words "public domain" used here mean "public lands" which are subject to sale and disposition under the general land laws. *Newhall* v. *Sanger*, 92 U. S. 761; *Barker* v. *Harvey*, 181 U. S. 481, 490; *Mann* v. *Tacoma Land Co.*, 153 U. S. 273, 284.

The object of the creation of the special tribunal to settle private grants in California was to segregate them from the "public domain," and thus open up a vast area of that domain in California to settlement under the homestead and preëmption laws. *Botiller* v. *Dominguez*, 130 U. S. 238, 249. There was no presumption in favor of the jurisdiction of this special tribunal, and we must look to the act creating it to determine its jurisdiction and to ascertain whether the power sought to be exercised is lawful.

*United States* v. *Santa Fe,* 165 U. S. 675, 714. This being true, the jurisdiction of this tribunal to extinguish the sovereign rights of California in its presumptive title to all its submerged lands must clearly appear. The California Enabling Act of September 9, 1850, c. 50, 9 Stat. 452, 453, provides specifically that "all the navigable waters within the said state shall be common highways, and forever free, as well to the inhabitants of said state as to the citizens of the United States."

There is no reported case, so far as we have been able to discover, where the land commissioners of California passed upon the claim of a private grantee to full ownership and control of lands below ordinary high-water mark.

The field notes of the survey were not introduced. A certified copy is here produced. These field notes form part of the survey and are to be considered with the plat to which they relate. *Heath* v. *Wallace,* 138 U. S. 573, 583.

There is nothing in the Mexican patent, the petition for confirmation, the decree of confirmation, or the terms of the patent from the United States, to disclose that any lands covered by water were included or intended to be included in the grant, but by examining the plat of survey it is observed that the surveyor general has run, on the western boundary, two lines, one meandering ordinary high-water mark on the shore, and expressly noted as such on the plat, and the other out to the deep channel used by ships in entering and leaving the harbor, and at one point beyond the center of the bay of San Diego.

Examination of the field notes shows that only one of these lines was actually run upon the ground, to wit, that marking the line of ordinary high-water mark; that the surveyor erroneously assumed the description of the west boundary in the decree required him to project the lines to the deep channel used by ships as shown by some map of the Coast Survey. Projecting these was a mere paper survey and not an actual survey on the ground.

Returns by a surveyor general embracing the descrip-
tions of a survey of land are prima facie evidence, and plats
and certificates, on account of the official character of the
surveyor general, have accorded to them the force and
effect of a deposition, *United States* v. *Hanson*, 16 Pet. 200,
201, but "it is not the mere assertion of a surveyor that he
had surveyed land that makes it so," *Winter* v. *United
States*, 30 Fed. Cas. 350, 365, and the admission of the
survey in evidence does not admit its validity. *United
States* v. *Breward*, 16 Pet. 143, 146.

The legal effect of a survey must be determined not by
what the surveyor said but by what he did. An actual
survey on the ground was essential to the validity of the
grant. *Ellicott* v. *Pearl*, 10 Pet. 411, 441; *Muse* v.
*Arlington Hotel Co.*, 68 Fed. Rep. 637; *United States* v.
*Lawton*, 5 How. 10, 27; *Scull* v. *United States*, 98 U. S. 410,
419.

Furthermore a computation of the elements by which
the surveyor established these conjectural lines discloses
that these lines fail to close by a distance of approximately
465 feet. This inaccurate paper survey can not be held to
enlarge the terms of the decree and patent so as to embrace
lands which are not those specified in the decree and patent
as an island or peninsula. The submerged lands and the
high lands are naturally and legally separate and distinct,
were each separately surveyed by the surveyor general,
and are separately shown on the plat of survey annexed to
the record. The decree of confirmation confirmed the
title to the island or peninsula as shown on the original map
filed with the espediente, which embraced only the high
land. The patent quotes the language of this decree in
describing the land according to this map. The descriptive
language of the patent referring to the subsequent survey
is "the tract of land embraced and described in the fore-
going survey." As pointed out, this survey described two
tracts, one, land in its ordinary sense of visible high land,

the other, invisible land, the soil under the sea.  To construe the patent as describing this invisible soil under the sea is to give undue weight to an act of the surveyor wholly outside his official duty and to·one expression in the instrument at the expense of the rest of it, and to convict the patent of glaring inconsistencies and of a clear .departure from the terms of the decree of confirmation which it was to effectuate.

The reasonable construction of the patent, in the light of the original map and the decree of confirmation, as well as from the terms of the patent itself, is that the act of the surveyor general  in separately platting on paper the soil under the sea was "not within the scope of his proper official functions," and that the island or peninsula, "the tract of land embraced and. described in the foregoing survey," title to which passed by the patent, was the fast land as surveyed and monumented on the ground and as indicated on the plat.   This construction  harmonizes all parts of the patent, the Mexican grant, the decree, and the policy of Mexico and the United States not to grant to individuals the soil under the sea.   It gives· the grantee all the land actually surveyed.

It is respectfully urged, therefore, that the patent properly construed does not embrace these submerged lands.  If, however, the patent can be construed as intending to embrace them, it is to this extent void and subject to collateral attack.

. "Neither the treaty of Guadalupe Hidalgo nor patents under the Act of March 3, 1851, are original sources of private titles, but are merely confirmatory of rights already accrued under a former sovereignty."  *Los Angeles Milling Co.* v. *Los Angeles,* 217 U. S. 217, 227, 233; *Boquillas Cattle Co.* v. *Curtis,* 213 U. S. 339, 344.  .

The right to collaterally assail the patent depends upon whether the Land Department had jurisdiction of these lands. · Since the Department had neither by survey nor

patent the right to enlarge the grant, this, in turn, depends upon whether there was an express grant of these tide and submerged lands by the former government.

Upon the admission of California as a State, no express grant of such lands having been made by the former government, such lands were not part of the public domain, nor in any sense subject to the control of the Land Department or its power to determine any question of title thereto. *Iowa* v. *Rood*, 187 U. S. 87, 93.

Defendant's right, title or interest, if any, in the lands below high-water mark are in any view subject to the paramount servitudes and powers of the federal and state governments to protect navigation, commerce, and fishery.

Congress did not authorize by the Act of July 27, 1917, condemnation of the tide lands.

The United States was entitled to have the land above high-water mark valued under proper instructions as to the title to, and character of ownership of, lands under navigable waters fronting thereon.

*Mr. P. F. Dunne*, with whom *Mr. Read G. Dilworth* was on the briefs, for defendant in error and appellee:

The grant to Carrillo was not subject to the alleged easement of occupancy for military and naval purposes. It was not a grant to a foreign colonist or to an impresario, but to a Mexican citizen. *United States* v. *Cervantes*, 18 How. 553, 555. In *Arguello* v. *United States*, 18 How. 539, it was held that the first eight sections of the law of 1824 "apply wholly to colonists and foreigners."

The alleged easement of occupancy, under article 5 of the law of 1824, is attributable to the public lands, to the vacant lands of the nation; it is not related to lands upon which the State or Territory has already exercised its dispositive power, and which have passed, as a fact accomplished, into the vested right of private ownership. *United States* v. *Arredondo*, 6 Pet. 691, 733; *United States*

v. *Reading,* 18 How. 8; *United States* v. *Yorba,* 1 Wall. 412, 423; Hall's Mexican Law, p. 151; *Republic* v. *Thorn,* 3 Texas, 499, 505; *Palmer* v. *United States,* 1 Hoffman, 249, 269; Regulations of November 21, 1828; *United States* v. *Vallejo,* 1 Black, 541, 551, 552; *United States* v. *Workman,* 1 Wall. 745, 761; *Camou* v. *United States,* 171 U. S. 277; Mexican Law of April 6, 1830.

Indeed, if the easement of confiscation set up here could be strained out of article 5 of the laws of 1824, and imputed as a sovereign prerogative to the Mexican government, it would not be communicable, by treaty or otherwise, to a government of constitutional guarantees like ours. *Charles River Bridge Case,* 11 Pet. 641; *Pumpelly* v. *Green Bay Co.,* 13 Wall. 177, 178; *Chicago, Burlington & Quincy R. R. Co.* v. *Chicago,* 166 U. S. 235, 236; *Fremont* v. *United States,* 17 How. 564.

No easement of occupancy arose from the provision of the grant safeguarding "crossings, roads, and servitudes (*servidumbres*)." *Harvey* v. *Barker,* 126 California, 262; affd. 181 U. S. 481; *Eldridge* v. *Trezevant,* 160 U. S. 452.

Distinguishing: *Los Angeles* v. *Los Angeles Milling Co.,* 152 California, 645, *s. c.* 217 U. S. 217; *Boquillas Cattle Co.* v. *Curtis,* 213 U. S. 342.

The decree of confirmation and the resulting patent ascertained and settled the title conclusively between the United States and defendant. Act of March 3, 1851; *Rodrigues* v. *United States,* 1 Wall. 582, 588; *United States* v. *Elder,* 177 U. S. 116; *United States* v. *Turner,* 11 How. 667; *Fremont* v. *United States,* 17 How. 542, 543, 556; *Botiller* v. *Dominguez,* 130 U. S. 252; *United States* v. *Fossatt,* 21 How. 445, 448; *United States* v. *Workman,* 1 Wall. 745; *Los Angeles Milling Co.* v. *Thompson,* 117 California, 594; *s. c.* 180 U. S. 72; *Harvey* v. *Barker,* 126 California, 262; *s. c.* 181 U. S. 481; *Phillips* v. *Mound City Association,* 124 U. S. 605.

The reservation of the alleged easement should have

been embodied in the decree and patent. *Harvey* v. *Barker*, 126 California, 262; *s. c.* 181 U. S. 481; *Los Angeles* v. *Los Angeles Milling Co.*, 152 California, 645, 649; *United States* v. *Osio*, 23 How. 273; *Mitchel* v. *United States*, 9 Pet. 711, 761; *Lynch* v. *Bernal*, 9 Wall. 315; *Grisar* v. *McDowall*, 6 Wall. 363; *United States* v. *Santa Fe*, 165 U. S. 675, 709.

In no event, under the Act of March 3, 1891, can the plaintiff go behind the patent.

The western boundary of "the whole of North Island" is precisely defined to include the tide land area, by the United States patent and the plat of survey accompanying the same and a part thereof. The State of California, as of its sovereign status, never had title to these particular tide lands, lying inside of the boundary line fixed by the United States survey which supervened upon the decree of confirmation and accompanied the patent. These particular tide lands, by elder and patented title, passed in fee simple absolute to the Mexican grantee, or his successors in interest, pursuant to the confirmation of the Mexican grant. *Jover* v. *Insular Government*, 221 U. S. 623, 629; *Beard* v. *Federy*, 3 Wall. 478; *United States* v. *Fossatt*, 21 How. 445, 448; *Los Angeles Milling Co.* v. *Thompson*, 117 California, 594; *s. c.* 180 U. S. 72; *Barker* v. *Harvey*, 181 U. S. 481; *Teschemacher* v. *Thompson*, 18 California, 11; *Goodtitle* v. *Kibbe*, 9 How. 470; *Knight* v. *United States Land Association*, 142 U. S. 161; *Shively* v. *Bowlby*, 152 U. S. 1; *Los Angeles* v. *Los Angeles Milling Co.*, 152 California, 645; *s. c.* 217 U. S. 217; *Boquillas Cattle Co.* v. *Curtis*, 213 U. S. 342.

The public right of navigation and fishery, and the public regulation of the same, are not in question here.

The appraisement, under the Act of July 27, 1917, is of the whole of North Island, not some part; and the whole of North Island, for the purposes of the appraisement, is measured by "any rights private parties may have in the

said island over and beyond any rights thereto in the United States."

The survey was properly made, and in any event is conclusive in this proceeding. *Craig* v. *Radford,* 3 Wheat. 598; *United States* v. *San Jacinto Co.,* 125 U. S. 296, 301; *Knight* v. *United States Land Association,* 142 U. S. 190; *Cragin* v. *Powell,* 128 U. S. 699, 700; *Quinby* v. *Conlan,* 104 U. S. 425–427.

MR. JUSTICE HOLMES delivered the opinion of the court.

These cases arise out of a proceeding brought by the United States under the Act of July 27, 1917, c. 42, 40 Stat. 247, for the double purpose of ascertaining the rights of private parties in North Island in the harbor of San Diego, California, and of condemning the whole of said island for public purposes after the value of such rights has been fixed and paid into Court. The proceeding was begun by a bill in equity against the Coronado Beach Company. In its answer that Company alleged title to the whole island, and after a hearing obtained a decree in its favor, subject to the question of the rights of the United States brought up by the appeal in No. 525. The case then was transferred to the law side, the value of the plaintiff's island was assessed by a jury, and a judgment was entered that upon payment of $5,000,000 into Court within thirty days the United States might have a final order of condemnation. The writ of error in No. 524 presents the questions raised in this stage of the case.

The title of the Corondo Beach Company is derived from a Mexican grant of May 15, 1846, to one Carrillo, a Mexican citizen, the Company having succeeded to his rights. At this point it is necessary to mention only that Carrillo is given the right to enclose the land "without prejudice to the crossings, roads, and servitudes." The grant was under a law of August 18, 1824, by the fifth

section of which "If for the defence or security of the nation the federal government should find it expedient to make use of any portion of these lands for the purpose of constructing warehouses, arsenals, or other public edifices, it may do so, with the approbation of the general congress, or during its recess with that of the government council." Hall, Laws of Mexico, 148, § 492. The United States interprets this as a reservation of power against all persons, as one of the servitudes to which the Carrillo grant was subject, and as a sovereign right to which it succeeded when the land became territory of the United States. We cannot accept so broad an interpretation. We need not repeat the discussion in *Arguello* v. *United States*, 18 How. 539, wherein it was laid down that the first eight sections apply wholly to colonists and foreigners. The decision immediately concerned the fourth section of the law, but the ground for the construction given to it was that the others obviously were limited as stated and that there was no reason for giving to the fourth a greater scope. Moreover the second section states that "The objects of this law are those national lands which are neither private property nor belong to any corporation or town (pueblo), and can therefore be colonized." *United States* v. *Yorba*, 1 Wall. 412. It is hardly credible that section five should have been intended to reserve the right to displace private owners, and wholly incredible that it reserves the right to do so without compensation, especially when it is noticed that by the law of April 6, 1830, the value of lands taken for fortification, &c., is to be credited to the States. *Camou* v. *United States*, 171 U. S. 277, 284, 285. Hall, Laws of Mexico, 108, § 291.

The more serious questions arise on the writ of error and concern primarily the extent of the grant; the main dispute being whether the Company owns the tide lands in front of the upland of the island. Carrillo's petition states as its ground that he is in want of proper land for the breeding of

cattle and horses and asks the grant for a cattle farm of the island or peninsula in question, bounded substantially as in the subsequent grant, viz: on the north by the Estero of San Diego towards the town, east by the end of the rancho of Don Augustin Meliso, south by the sea, and west by the bay or anchorage for ships, as explained by the map which goes with the espediente. On April 20, 1852, Billings and others then holding the title petitioned the Commissioners, to settle Private Land Claims, appointed under the Act of March 3, 1851, c. 41, 9 Stat. 631, to confirm to them this tract of land. The petition was rejected by the Board but on appeal the title was declared good and confirmed by the District Court of the United States. The decree stated the boundaries on the north, east and south as in the original grant, and "west by the anchorage for ships, according to the documents of title and map to which reference is had." This decree was filed on January 12, 1857; on May 7, 1867, after an appeal to this Court had been dismissed, there was a substitution of Peachy and Aspinwall as parties, and on June 11, 1869, a patent was issued reciting the decree, a return with a plat of a survey approved under § 13 of the Act of 1851, and giving and granting to them the land described in the survey. The Mexican map is not in the record and is not material since the plat accompanying the patent of the United States shows the line marking the "Anchorage for Ships," which includes the tide lands in dispute.

The jurisdiction of the decree and the validity of the patent so far as they cover the tide lands is denied by the United States, a special reason being found in the fact that California became a State in 1850 and thereby acquired a title to the submerged lands before the date of the decree. But the title of the State was subject to prior Mexican grants. The question whether there was such a prior grant and what were its boundaries were questions that had to be decided in the proceedings for confirmation and there was

jurisdiction to decide them as well if the decision was wrong as if it was right. The title of California was in abeyance until those issues were determined, as the decree related back to the date of the original grant. The petitioner asked a confirmation of the tract conveyed to Carrillo. The grant to Carrillo was bounded "west by the anchorage for ships" and although it well may be that in view of the purpose set out in his petition and the circumstances the grant could have been construed more narrowly, that was a matter to be passed upon and when the decree and the patent went in favor of the grantee it is too late to argue that they are not conclusive against the United States. It is said that the field notes, not put in evidence at the trial, show that the deep water line was not surveyed, but was taken from the Coast Survey maps. But however arrived at it was adopted by the United States for its grant and it cannot now be collaterally impeached. *Knight* v. *United States Land Association*, 142 U. S. 161; *San Francisco* v. *Le Roy*, 138 U. S. 656. *Beard* v. *Federy*, 3 Wall. 478. It was suggested that the bill might be regarded as a direct attack upon the patent; but this probably was an afterthought and in any event the attack would be too late. Act of March 3, 1891, c. 561, § 8, 26 Stat. 1099. *United States* v. *Chandler-Dunbar Water Power Co.*, 209 U. S. 447, 450.

A subordinate objection is urged to the admission of maps or drawings showing the adaptability of the island to a great system of improvements possible if the Coronado Beach Company owned the submerged land. It is urged that such improvements were speculative, remote, and not shown to be commercially practicable. But the drawings were admitted only to illustrate the opinion of the witness as to value and were explained as meaning no more. If the reasons for his opinion were inadequate they detracted from the weight of his testimony but were not inadmissible on that account.

Finally it is contended that the Government took only the upland. But the Act of 1917 provides for the taking of "the whole of North Island" and for "the determination and appraisement of any rights private parties may have in said island," and the bill follows the act and prays that if the defendant company has any right to the tract or any part thereof the right "and the whole thereof" may be "appraised and condemned." We discover no error in the proceedings below.

*Decree and judgment affirmed.*

Mr. Justice Clarke took no part in the decision of this case.