**UNITED STATES v. .15 OF AN ACRE OF LAND, MORE OR LESS, ON TRUNDY POINT, TOWN OF CAPE ELIZABETH, CUMBERLAND COUNTY, MAINE, et al.**

**No. 1724.**

District Court, D. Maine, S. D.

June 19, 1948.

Findings of Fact and Conclusions of Law
June 29, 1948.

Alton A. Lessard, U. S. Atty., of Lewiston, Me. and Edward J. Harrigan, Asst. U. S. Atty., of Portland, Me., for petitioner.

Leon V. Walker, Sr., and Leon V. Walker, Jr., both of Portland, Me., for defendants.

CLIFFORD, District Judge.

This is a condemnation proceeding commenced in this Court on June 19, 1945, by the United States of America to acquire a permanent easement traversing certain land owned by the defendant, Alice D. Oliver, which is situated on Trundy Point, in the Town of Cape Elizabeth, Cumberland County, State of Maine.

The sole issue before this Court is the determination of the amount of damage the defendant is entitled to receive as just compensation for the land taken and for the diminution in value of the land not taken.

It is admitted that the defendant is the absolute owner in fee of the property, free from encumbrances, liens or mortgages, and that all legal formalities, including service of the petition and judgment on the declaration of taking upon the owner, and service upon all parties in accordance with the order of the Court, have been complied with. It was likewise, agreed that the case would be heard by the Court without jury.

It was agreed by the parties hereto that the highest and best use for which this property is adapted is for residential real estate development.

The Court, accompanied by attorneys, appraisers, and a number of represenatives of the parties to this controversy, spent considerable time walking over and about the land in question, noting particularly the terrain, the view of the ocean, the entrance to Portland Harbor, the islands of Casco Bay, the type of housing and other facilities located on Shore Acres, located southerly of defendant's property, and other points indicated by the attorneys for both parties. This view was taken by agreement of counsel and prior to the introduction of any evidence in the case, immediately after the Assistant United States Attorney had concluded his opening statement to the Court.

The property of the defendant is in its original, raw, undeveloped state. No lots have been staked out, no additional roads to that presently existing have been built, and no water, electricity, or sewer connections have been installed. It consists of approximately twenty-eight acres, located about nine miles from the City of Portland, Maine. It has a frontage of twenty-two hundred feet on the shore of Casco Bay, part of this frontage being a beach fairly suitable for bathing purposes, and a cove suitable for the tying up of small boats. The property commands a splendid view of the entrance to Portland Harbor, the many islands in Casco Bay, and, from some parts of the defendant's land, particularly from the plateau through which the cable easement runs, a good view of the Atlantic Ocean, and the eastern shore line to the tip of Cape Elizabeth at Two Lights.

Cape Elizabeth, with its schools, neighborhood stores, public utilities, transportation facilities, good roads, wooded areas, picturesque shore line, and proximity to both South Portland and Portland, has been quite thoroughly settled by those earning their livelihood in the nearby metropolitan area, many of such people having built substantial year round residences. It is the only piece of property suitable and available for residential development purposes on Cape Elizabeth, except what may still be acquired on Shore Acres, a tract of land adjacent to defendant's property.

It is the opinion of this Court that the defendant's land provides a real and practicable opportunity for a valuable residential development within the reasonably near future.

The former owner of this land died in 1938. The estate was handled by a bank located in St. Louis, Missouri. It had attempted in 1941 to find a purchaser, without success. Due to conditions then existing, with war in Europe raging, and the feeling prevalent that the United States would be involved in that war in the near future, the demand for real estate in this area was at a low ebb. Finally, Mr. Lincoln Payne, a Portland real estate broker, undertook to

find a purchaser with the understanding that his client, the bank, "was very anxious to clean it up" (R. 156) and "wanted an offer right quick" (R. 163). He obtained an offer from this defendant of five thousand dollars ($5,000.00) for the property, and, after some delay, this offer was accepted. In the opinion of Mr. Payne, it was a "steal" at this price (R. 164).

Shortly after the defendant purchased this land, the United States Army obtained permission from the owner to lay a temporary telephone cable thirty inches deep in the ground, bisecting the defendant's property for a distance of 1310.89 feet, with a constant width of five feet. The cable ran from a fire control tower located some distance southwesterly of defendant's land through the tract itself to the shore of the bay and thence along the ocean floor to harbor installations. In the words of the counsel for the United States, the cable was laid "along the line of a certain old road which appears there on the face of the earth" (R. 4). This road, a dirt road dwindling into wheel tracks, was the only one crossing the defendant's land.

The defendant's husband, Lieutenant Commander James Oliver, managed the business affairs of his wife. In 1941 he was in public service in Washington, D. C. Upon leaving this office, he entered the service of the United States Coast Guard in which he remained until April, 1946, or nearly a year after condemnation proceedings had been commenced by the United States. Shortly after his return to Maine in 1946, he started work preliminary to the development of this land for subdivision purposes for which his wife had originally purchased it in 1941. A civil engineer was employed, a survey made, and a plan drafted indicating in detail his conception of the most practicable residential development. A tractor was used to rough out a road in a low lying sector of the tract, referred to in the record as Trundy Road South. This roughed out road lay some thirty to sixty feet southerly of the existing road and the cable easement.

The United States contended (1) that the admission of the plan showing the proposed subdivision was erroneous; (2) that all testimony purporting to estimate the damage by reference to the lots in the proposed subdivision was incompetent; (3) that the cable easement could cause but little damage to the defendant's property because of the existence of an ancient easement, an old road reserved by a deed in 1859, traversing the same ground under which the cable was buried; (4) that the purchase price at which the defendant bought the tract in 1941 was the fair market price at that time and that it was also the fair market price in June, 1945; and (5) that damages could be minimized by developing the area in a different manner from that shown by defendant's plan.

The claim of the United States was that, in view of the above contentions, the defendant's property, consisting of about a million square feet having a total value in June, 1945, of $5,000, possessed a value per square foot of one half cent; and that the total damage to the property of the defendant, including severance damage, was $650.

The claim of the defendant is that the damage figure is within a range between $3,558.57 and $6,007.90, the estimates submitted by two of her appraisal witnesses.

Both parties and the Court are in accord that the market value of the land at the time of taking, having in mind the highest and best use for which it is adaptable and marketable in the reasonably near future, is the measure of compensation. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236.

Attention will now be directed to the two objections raised by the United States to the admissibility of evidence.

The first contention in this respect was that a blueprint of the proposed subdivision of the defendant's land was erroneously admitted into evidence. This blueprint was drawn in August, 1946, fourteen months after the condemnation proceedings were instituted by the United States. Following a survey of the tract in which elevations, outcroppings of ledge, and other physical conditions were noted, the defendant's engineer prepared the plan to which objection was made, which reflected, in the words of the engineer, (R.10) "* * * the best layout we could make relative to the terrain itself from the standpoint of economy,

and from the standpoint of the number of lots." Counsel for the United States objected to the admission of the plan for the reason that since it was prepared subsequent to the taking by the Government, it might mislead the Court into valuing the property as if it consisted of existing house lots. The plan was nevertheless admitted.

As already indicated, this case, by stipulation, was tried without a jury. As stated, a view was had by the Court under circumstances related herein, and the property was found to be in its original, raw, undeveloped state. There was, therefore, no possibility of the Court being misled, by the introduction of this plan, to the conclusion that the defendant's property consisted of staked out, existing house lots, or that it was already a developed project on the face of the earth. The plaintiff contended that this area would be as well if not better utilized for residential purposes, without disturbing the present road running over the cable, by a different layout of proposed lots, but the Court was not impressed with this evidence. The plaintiff's proposal, in the opinion of the Court, was neither feasible nor economically sound. The defendant's plan was of assistance to the Court in helping it visualize a practicable method of development of defendant's property for the purposes for which it was best adapted, and the Court, in the exercise of its discretion, having only this purpose in mind, admitted it.

The plaintiff cites two cases in support of its objection to the admission of the plan. In Ogden v. Pennsylvania R. Co., 229 Pa. 378, 78 A. 929, the condemnee wished to offer into evidence leases of five lots of his land in order to show that the land was adaptable to subdivision. The Pennsylvania court suspected that the condemnee wished to get the terms of the leases before the jury to fix in its mind the consideration therein set forth. But this Court fails to see how this case can be relied upon as authority for the exclusion of the plan in this case, in view of the following language found in the opinion (78 A. at page 931): "Under our decisions, a plan or plot showing subdivisions into lots is sometimes admitted for the purpose of showing the number of lots into which the whole tract can conveniently be subdivided; and *we cannot say that it would have been error to admit the plot offered by the plaintiff in this case*." (Emphasis supplied.)

The only other case relied upon to exclude the plan is Rothenberger v. City of Reading, 296 Pa. 423, 146 A. 104, in which the chief consideration influencing the court was that a jury would be misled into thinking that the land was already developed into lots, and should be valued accordingly. The holding of the case is merely that exclusion was not error, not that inclusion would be error, there being here no jury to be misled.

In United States v. Coronado Beach Co., 255 U.S. 472, 41 S.Ct. 378, 65 L.Ed. 736, Mr. Justice Holmes approved, for the Court, the admission of drawings showing the adaptability of the condemned land to a proposed system of improvements, saying in 255 U.S. at page 488, 41 S.Ct. at page 380, 65 L.Ed. 736: "But the drawings were admitted only to illustrate the opinion of the witness as to value and were explained as meaning no more. If the reasons for his opinion were inadequate they detracted from the weight of his testimony but were not inadmissible on that account." Such would seem to be the common sense way in which to treat a matter of this kind.

A case containing several of the elements present in the present matter is Calumet River Ry. Co. v. Clara Moore, et al., 124 Ill. 329, 15 N.E. 764. The trial judge had admitted a plat of proposed improvements to a waterfront area. The upper court affirmed this action, saying, in 124 Ill. at page 336, 15 N.E. at page 767: "It was not pretended that the slip had been constructed or the docks erected; indeed, it was a fact known to the jury from their inspection of the premises, that the land was in its natural state, unimproved in any way. This being so, the exhibiting of a plat showing no more than a contemplated improvement, to which it was thought the premises were well adapted, and which the construction of the proposed railway would render impossible, or seriously interfere with, could not have misled the jury into allowing damages for an improvement not in existence."

960

If such a ruling was proper where a jury was present, it is all the more sensible where the court is the trier of fact.

That such an approach as that adopted in this case is not only permissible but even desirable is affirmed in Ohio Valley Railway & Terminal Co. v. Kerth, 130 Ind. 314, 30 N.E. 298, where a condemnee wished to introduce a map showing that his land was already platted into proposed extensions of a nearby city street system. The court made the following statement in 130 Ind. at page 317, 30 N.E. at page 299: "* * * it was contended that one element of value that the tract of land had was its location in close proximity to a large and growing city, and its susceptibility to be platted and used as residence property made it more valuable than it otherwise would be. * * * this could be more clearly demonstrated by the use of a map or plat made from actual measurements than by the mere parol statements of witnesses."

■ In the light of the above authorities, the fact that no jury could here be misled, the further fact that the Court had viewed the premises, and the final fact that in reaching the conclusions and findings hereinafter set forth, the Court restricted the impact of the plan to showing the use for which the land was best adapted, the admission of the plan is deemed proper.

The second objection of the United States to the admissibility of evidence, closely allied to that just discussed, is that the testimony of the defendant's witnesses was incompetent since it was based on the proposed subdivision of the defendant's land into lots as shown in the blueprint. The following excerpt from the testimony may be quoted to show the nature of the plaintiff's objection and the ruling made thereon (R. 40).

"Mr. Harrigan: May it please the Court, may I interrupt at this moment. I wish now to enter an objection to any testimony based upon any proposed lot division of this land for the same reason that I objected yesterday to the original admission of the plan itself. We feel that it doesn't represent the land. It is purely a paper chart and doesn't represent any improvement on the face of the earth. We feel that the chart is misleading and any testimony based on it is open to the same objection.

"The Court: Of course, the Court appreciates the fact that the land there has never been developed. It is simply to show what might be done with that property, and for whatever it may be worth—having that fact in mind—I will admit that testimony."

■ The Court has disregarded substantially all of the testimony of two of the defendant's witnesses, namely, that of Mr. Worth and Mr. Payne, both of whom have been real estate brokers and appraisers in Portland, Maine, and vicinity, for a period of many years, and each of whom is familiar with and qualified to testify concerning real estate values in the area in which the defendant's property is located. Their testimony, however, was confined almost exclusively to a lot by lot evaluation, and, in so far as that part of their evidence is concerned, it cannot be considered.

There is, however, sufficient evidence to assist the Court in determining the amount of damages sustained by the defendant's property.

A view of the premises clearly revealed that the cable easement will adversely affect a substantial part of the central segment of Mrs. Oliver's property. Evidence of comparable sales of nearby lots was introduced by both the plaintiff and the defendant. This testimony related to sales of seven parcels of property from 1944 to 1947.

The lowest price received was that of 2.4 cents a square foot in a sale to one Maling completed in May 1947 (R. 73) but reflecting a price agreed upon in May, 1944 (R. 144). This was not shore property but was accessible by a narrow dirt road. The seller testified that he sold this parcel during a period when sales were practically nonexisting in order to realize some needed income (R. 145, 149).

In November, 1944, property was sold to one Langley for 2.7 cents a square foot. This was shore property but was not serviced by roads, water, or electricity. It was as completely undeveloped as was defendant's property.

In October, 1946, property was sold to one Thompson for five cents a square foot (R. 144). Although located by the shore, this was also wholly undeveloped property, not serviced by any road, water, or electricity. In fact, the plaintiff's witness, Mr. Hearn, admitted that it was a long distance from any source of drinking water (R. 82).

In March, 1947, shore property was sold to one Boynton for eight cents a square foot. This property was not accessible by any completed highway and was approximately twice as far from water supply as at least part of the Oliver Property (R. 143, 144).

In April, 1947, land was sold to one Foss for five cents a square foot. This was not shore property. (R. 74, plaintiff's Exhibit 2.)

In July, 1947, land was sold to one Boyce for six cents a square foot. This, also, was not shore property (R. 146).

Later in 1947 property was sold in nearby Hannaford Cove at about 28 cents a square foot, despite the fact that it is located in an area characterized by small, somewhat insubstantial cottages, and lacking access to a year round water supply (R. 148).

From this data, it is apparent that a price range applicable to the Oliver Property is that between about 2.7 cents a square foot and 8 cents a square foot. The market condition prevailing in 1944 is certainly not to be taken as closely comparable to that in June of 1945, inasmuch as we were in the midst of war in both the Atlantic and Pacific theaters in the earlier year. And although price levels in 1946 and 1947, the other years for which sales data are available undoubtedly were higher than those existing in 1945, it is this Court's opinion that the years 1945, 1946, and 1947 share to some extent a most important factor—the termination of war. In June, 1945, the European war was over, Japan was whipped, and within two months she unconditionally surrendered.

That this affected market values was stated by Mr. Baker, a veteran real estate broker, the President and Treasurer of Shore Acres Land Company, and a man intimately acquainted with values on Cape Elizabeth (R. 149). Mr. Worth stated, in answering the Court, that there was an increase in real estate value because of a growing feeling of optimism in 1945 (R. 183).

The view of the Oliver property and land adjacent thereto, the fact that the Oliver tract is eminently desirable for development purposes on Cape Elizabeth, the prices and conditions of the sales above noted, and the time when the United States began condemnation proceedings lead this Court to find that the value of this land, in the affected area, in June, 1945, was 3 cents a square foot.

The plaintiff, through its only witness as to value, testified that the revenue stamps on the defendant's deed indicated a payment of five dollars and fifty cents, and that to him signified "the maximum value of $5,000", and that this, being the purchase price paid for the property, was the fair market value in June, 1941, and that the fair market value remained the same from 1941 until the date of the taking in June, 1945.

Much testimony was introduced with reference to the conditions surrounding the purchase of the Oliver land through the midwestern bank, conditions briefly described earlier in this opinion. The defendant argues that such circumstances made the transaction a forced sale, and the price reached far below that which would have prevailed had both the buyer and seller been willing. The plaintiff, however, maintains that there was no such pressure forcing the sale as to render the price other than a fair market price.

It is not, in this Court's opinion, necessary to pass upon the question of the fair market value in 1941, for whatever the value then was had little relation to the fair market value in 1945. Although the Government's appraisal witness, Mr. Hearn, stated that he felt that there was no change in market value between 1941 and June, 1945, he did not give any reasons for his opinion (R. 54). In view of the fact, as above noted, that in June of 1945 the United States was anticipating an early peace, whereas in 1941 it was anticipating

an early involvement in war, this opinion lacks support in both fact and reason.

The second assumption of the plaintiff was that the damage to the Oliver property was greatly minimized by the existence of an old easement over the exact location traversed by the cable. The Government's witness, Hearn, testified that in his examination of the chain of title to the property now owned by the defendant, he found a reservation in a deed dated in 1859, referring to "the road usually traversed" (R. 53). He further testified that he saw but one road traversing the property, with no indication of any other road ever having existed (R. 53). Mr. Hearn gave the impression to the Court that it was his opinion, to which he attached much importance in setting a figure of damage, that the cable was buried under the old road mentioned in the 1859 deed. That the United States Attorney adopted this position was evident from his statement that the road presently existing "is an old established road" (R. 128). This position was not abandoned by the Government until the last witness for the defendant, Fred H. Darling, who lived on the tract in suit from 1920 to 1940, testified that he himself built the road presently existing on the premises (R. 200); that the original road ran along the top of the ridge on the northerly part of the property (R. 202); that he erected a gate barring the entrance to the original road in 1920 (R. 202); and that the gate remained in place for at least twenty years (R. 203).

In the plaintiff's reply brief it was acknowledged that (P. 1): " * * * after the testimony of the witness Fred Darling disclosing information of which we were previously unaware and the truth of which we have no reason to doubt, it would not appear that there is any substantial ground for resting on any such claim."

The important fact remains, however, that the United States approached its task of appraising the damage done to the Oliver property on the basis of this unfounded assumption, an assumption which must seriously have depressed the Government's estimate of value.

A third weakness on the Part of the United States was the attempt by its witness, Hearn, to reconcile two sharply conflicting estimates of damage made by him. The only report filed by Hearn, according to the testimony, was that dated in August, 1947, and bore $1,742, as his estimate of damages. On the witness stand, however, Mr. Hearn gave the figure $650 as his judgment, on which latter figure the Government relies on in this case.

Asked what basis he had used in arriving at the figure of $1,742, Mr. Hearn testified (R. 59): "I am figuring on the basis that the land over there is merely undeveloped land, and this layout is of developed land, and the value of $1,742 was in anticipation of this development. It was an anticipated value that if it was developed in accordance with this plan, $1,742 would be the damage; that is, after development."

Further cross examination proceeded as follows (R. 60, 61):

"Q. And if that is a good layout, and if that is the way the land ought to be divided, developed, and sold, the damage to the land in 1945, was $1,745? "A. After it is developed—after the land was developed.

"Q. Well, you knew you were finding a damage to that lot as of June, 1945? That is what you said. "A. Yes, that is what I stated."

Further testimony revealed that Mr. Hearn attributed great weight to the mere recording of a plan as an element of "developed property" (R. 86).

This testimony by the plaintiff's witness is so utterly confusing that no reliance can be placed upon it by this Court.

Contrary to Mr. Hearn's view, sales of lots in Shore Acres are quite helpful as comparative data, for the view of the area taken by the Court disclosed much land in Shore Acres not serviced by road, sewer, water, and electricity facilities, and in substantially the same raw, unimproved condition as was the Oliver property. Indeed, much of Shore Acres is situated further inland than the Oliver tract and for that reason is less desirable.

Finally, it appears that the appraiser for the Government made no attempt to differentiate the value of the section of land

affected by the cable from that of other more undesirable parts. He took a figure representing his opinion of the general average value per square foot and applied such figure to the area which in his judgment was damaged by the cable easement. The view of the premises convinces the Court that the sector affected by the cable is one of the most sightly and desirable portions of the Oliver Tract. The adoption of a general average figure, though helpful in other cases, would not appear to be fair under the circumstances of the present case.

■ As to the quantity of defendant's land damaged by the cable easement, the plaintiff's witness, Mr. Hearn, testified that he considered 64,520 square feet in the segment traversed by the cable to be a complete loss (R. 61–64). The Court accepts this figure as approximately correct and concludes that such is the area so substantially damaged that it may be considered the equivalent of taking the fee. The Court is in accord with the opinion of appraisal witnesses called by the defendant that this cable easement would have a serious depressant effect on the market value of defendant's property, having in mind that both the plaintiff and the defendant agree that the highest and best use for which this property is adapted is for residential purposes.

Findings of Fact

The Court, in conformity with the above opinion, finds the following facts:

(1) The Oliver property is an extremely desirable tract of land, almost the last substantial area on Cape Elizabeth, suitable for residential purposes.

(2) The highest and best use for which this property is now or in the reasonably near future suited is residential development on a subdivision basis, along the lines indicated in the plan submitted by the defendant.

(3) Such use is substantially interfered with by the cable easement, such easement having an effect equivalent to taking the fee to the extent of 64,520 square feet of land.

(4) The part of the Oliver tract through which the cable easement runs is not burdened with a prior existing easement.

(5) The square foot value of the part of the tract damaged by the cable easement is three cents ($.03).

Conclusion of Law.

(1) The defendant has been damaged to the extent of $1,935.60, to which amount interest must be added in accordance with the existing law.

A decree to this effect shall be entered.