## STEEL v. SMELTING COMPANY.

1. A patent executed in the required form and by the proper officers, for such a portion of the public domain as is by law subject to sale or other disposal, passes the title thereto, and the finding of the facts by the Land Department, which authorize its issue, is conclusive in a court of law. *Smelting Company* v. *Kemp*, 104 U. S. 636, cited upon this point and approved.

2. A party who claims to be aggrieved by such issue, although he cannot have the patent vacated or limited in its operation where it comes collaterally in question in an action for the recovery of possession, may obtain relief in a Court of Chancery, if he has such an equitable right as will estop the patentee or those claiming under him from asserting the legal title to the land. Otherwise such party must apply to the officers of the government, who, although not clothed with power to set the patent aside, may for that purpose bring suit in the name of the United States.

3. Mineral lands belonging to the United States, although lying within a town site on the public domain, are subject to location and sale for mining purposes, and a title to them is acquired in the same manner as to lands of that description which are elsewhere situate.

4. In ejectment for mineral lands by a party claiming under the patentee, the defendant asserted that he owned the demanded premises "by superiority of possessory title and priority of actual possession" of them as part of a town site; that the patentee was not a citizen; and that frauds, bribery, and subornation of perjury had been used to obtain the patent. *Held*, that it was the province of the Land Department to pass upon such matters before the patent was issued, and that they could not be set up to defeat the action.

5. A party cannot invoke the doctrine of estoppel against the owners by reason of improvements which, with their knowledge, he put upon the land, if he was aware at the time that it belonged to them, and that he had no title to it.

ERROR to the Circuit Court of the United States for the District of Colorado.

The case is stated in the opinion of the court.

*Mr. Thomas A. Green* for the plaintiffs in error.

*Mr. Alexander T. Britton*, *Mr. Walter H. Smith*, and *Mr. Jonas H. McGowan* for the defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

This was an action by the St. Louis Smelting and Refining Company, a corporation created under the laws of Missouri, against Steel and others, to recover the possession of certain real property in the city of Leadville, Colorado. It was com-

menced in one of the courts of the State, and on motion of the defendants was removed to the Circuit Court of the United States. The complaint is in the usual form in actions for the recovery of land, according to the practice prevailing in Colorado. It alleges that the plaintiff was duly incorporated, with power to purchase and hold real estate ; that it is the owner in fee and entitled to the possession of the premises mentioned, which are described, and that the defendants wrongfully withhold them from the plaintiff to its damage of $1,000. The plaintiff, therefore, prays judgment for the possession of the premises and for the damages mentioned.

The defendants filed an answer to the complaint, which appears to have been amended several times, the questions presented for our consideration having arisen upon the demurrer to the third amended answer. That answer denied the material allegations of the complaint and set up several special defences, and a counter-claim for the value of the improvements put on the premises. The plaintiff demurred to these defences and to the counter-claim. The demurrer was sustained to the defences and overruled to the counter-claim. The defendants elected to stand on their defences, and final judgment was accordingly entered on the demurrer for the plaintiff for the possession of the premises. To review this judgment the case was brought by the defendants to this court.

The amended answer averred that the defendants were the owners of the land in controversy " by superiority of possessory title and priority of actual possession " of the premises as part of a town site on the public domain of the United States, located and occupied since June, 1860 ; that the title of the plaintiff was derived from one Thomas Starr, to whom a patent was issued by the United States, bearing date on the 29th of March, 1879, embracing the premises in controversy ; and the special defences set up were that the patent was void ; that fraud, bribery, perjury, and subornation of perjury were used to obtain it ; and that Starr, the patentee, was estopped by his conduct from asserting title to the premises.

The patent, which is subsequenly stated to be a mineral patent, by which is meant that it was issued upon a claim for mineral land, is averred to be void on these grounds : that the

land which it embraces was part of the town site of Leadville when the claim originated, and was thus reserved from sale by the laws of Congress; that the land included in the town site was neither mineral nor agricultural; and that the patentee, Starr, was not a citizen of the United States, and had not declared his intention to become one when the patent was issued. These grounds are accompanied with a detail of the facts upon which they are founded, but they are sufficiently stated for the disposition of the questions arising upon them.

Land embraced within a town site on the public domain, when unoccupied, is not exempt from location and sale for mining purposes; its exemption is only from settlement and sale under the pre-emption laws of the United States. Some of the most valuable mines in the country are within the limits of incorporated cities, which have grown up on what was, on its first settlement, part of the public domain; and many of such mines were located and patented after a regular municipal government had been established. Such is the case with some of the famous mines of Virginia City, in Nevada. Indeed, the discovery of a rich mine in any quarter is usually followed by a large settlement in its immediate neighborhood, and the consequent organization of some form of local government for the protection of its members. Exploration in the vicinity for other mines is pushed in such case by new-comers with vigor, and is often rewarded with the discovery of valuable claims. To such claims, though within the limits of what may be termed the site of the settlement or new town, the miner acquires as good a right as though his discovery was in a wilderness, removed from all settlements, and he is equally entitled to a patent for them.

It is the policy of the country to encourage the development of its mineral resources. The act of July 26, 1866, c. 262, declared that all mineral deposits on lands belonging to the United States were free and open to exploration, and the lands in which they are found to occupation and purchase by citizens of the United States and those who had declared their intention to become such, subject to regulations prescribed by law, and to the rules and customs of miners in their several mining districts, so far as the same were applicable and not inconsis-

tent with the laws of the United States. This declaration of
the freedom of mining lands to exploration and occupation was
repeated in the act of Congress of May 10, 1872, c. 152, and is
contained in sect. 2319 of the Revised Statutes. Both acts pro-
vided for the acquisition of title, by patent, to mineral lands, —
the first act, to such as constituted lode claims ; the second, to
such as constituted placer claims.

The acts of Congress relating to town sites recognize the
possession of mining claims within their limits, and forbid the
acquisition of any mine of gold, silver, cinnabar, or copper
within them under proceedings by which title to other lands
there situated is secured, thus leaving the mineral deposits
within town sites open to exploration, and the land in which
they are found to occupation and purchase, in the same man-
ner as such deposits are elsewhere explored and possessed and
the lands containing them are acquired. Rev. Stat., sects.
2386, 2392.

Whenever, therefore, mines are found in lands belonging to
the United States, whether within or without town sites, they
may be claimed and worked, provided existing rights of others,
from prior occupation, are not interfered with. Whether
there are rights thus interfered with which should preclude
the location of the miner and the issue of a patent to him or
his successor in interest, is, when not subjected under the law
of Congress to the local tribunals, a matter properly cogniza-
ble by the Land Department, when application is made to it
for a patent; and the inquiry thus presented must necessarily
involve a consideration of the character of the land to which
title is sought, whether it be mineral, for which a patent may
issue, or agricultural, for which a patent should be withheld,
and also as to the citizenship of the applicant.

We have so often had occasion to speak of the Land Depart-
ment, the object of its creation, and the powers it possesses in
the alienation by patent of portions of the public lands, that it
creates an unpleasant surprise to find that counsel, in discuss-
ing the effect to be given to the action of that department,
overlook our decisions on the subject. That department, as
we have repeatedly said, was established to supervise the vari-
ous proceedings whereby a conveyance of the title from the

United States to portions of the public domain is obtained, and to see that the requirements of different acts of Congress are fully complied with. Necessarily, therefore, it must consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open to sale. Its judgment upon these matters is that of a special tribunal, and is unassailable except by direct proceedings for its annulment or limitation. Such has been the uniform language of this court in repeated decisions.

In *Johnson* v. *Towsley,* the effect of the action of that department was the subject of special consideration. And the court applied the general doctrine, "that when the law has confided to a special tribunal the authority to hear and determine certain matters arising in the course of its duties, the decision of that tribunal, within the scope of its authority, is conclusive upon all others," and said, speaking by Mr. Justice Miller, "that the action of the land-office in issuing a patent for any of the public land, subject to sale by pre-emption or otherwise, is conclusive of the legal title, must be admitted under the principle above stated, and in all courts, and in all forms of judicial proceedings, where this title must control, either by reason of the limited powers of the court, or the essential character of the proceeding, no inquiry can be permitted into the circumstances under which it was obtained." 13 Wall. 72, 83.

In *French* v. *Fyan,* a patent had been issued to the State of Missouri for swamp and overflowed land, under the act of Sept. 28, 1850, c. 84. In an action of ejectment by a party claiming title under a grant to a railroad company, which would have carried the title if the land were not swamp and overflowed, parol testimony was offered to prove that it was not land of that character, and thus to impeach the validity of the patent. The court below held that the patent concluded the question, and rejected the testimony. The case being brought here, the ruling was sustained. This court, speaking through Mr. Justice Miller, said: "We are of opinion that, in this action at law, it would be a departure from sound principle, and contrary to well-considered judgments in this court, and in others of high authority, to permit the validity of the patent

to the State to be subjected to the test of the verdict of a jury on such oral testimony as might be brought before it. It would be substituting the jury, or the court sitting as a jury, for the tribunal which Congress had provided to determine the question, and would be making a patent of the United States a cheap and unstable reliance as a title for lands which it purported to convey." 93 U. S. 169, 172.

In *Quinby* v. *Conlan,* decided at the last term, we said: " It would lead to endless litigation, and be fruitful of evil, if a supervisory power were vested in the courts over the action of the numerous officers of the Land Department, on mere questions of fact presented for their determination. It is only when those officers have misconstrued the law applicable to the case, as established before the department, and thus have denied to parties rights which, upon a correct construction, would have been conceded to them, or where misrepresentations and fraud have been practised necessarily affecting their judgment, that the courts can, *in a proper proceeding,* interfere and refuse to give effect to their action. On this subject we have repeatedly, and with emphasis, expressed our opinion, and the matter should be deemed settled." 104 U. S. 420, 426. See also *Vance* v. *Burbank,* 101 id. 514.

It is among the elementary principles of the law that in actions of ejectment the legal title must prevail. The patent of the United States passes that title. Whoever holds it must recover against those who have only unrealized hopes to obtain it, or claims which it is the exclusive province of a court of equity to enforce. However great these may be, they constitute no defence in an action at law based upon the patent. That instrument must first be got out of the way, or its enforcement enjoined, before others having mere equitable rights can gain or hold possession of the lands it covers. This is so well established, so completely embedded in the law of ejectment, that no one ought to be misled by any argument to the contrary.

It need hardly be said that we are here speaking of a patent issued in a case where the Land Department had jurisdiction to act, the lands forming part of the public domain, and the law having provided for their sale. If they never were the prop-

erty of the United States, or if no legislation authorized their sale, or if they had been previously disposed of or reserved from sale, the patent would be inoperative to pass the title, and objection to it could be taken on these grounds at any time and in any form of action. In that respect the patent would be like the deed of an individual, which would be inoperative if he never owned the property, or had previously conveyed it, or had dedicated it to uses which precluded its sale. And, of course, in both cases it is always open to show that the instrument was never executed by the parties whose signatures are attached to it, but is a simulated document. Where ejectment is founded upon either of these instruments, — the patent of the government or the deed of an individual, — the question being which of the parties has the legal title, it is irrelevant to introduce evidence to show that one of them ought to have had it, and might be able to get it, by a proceeding in some other tribunal or in some other form of action.

As to the allegations that fraud, bribery, perjury, and subornation of perjury were used to obtain the patent to Starr, only a few words need be said. The bribery and subornation of perjury are alleged to have been committed by him in inducing parties to make false affidavits respecting the claim patented to be laid before the Land Department; and the perjury alleged consisted in his own affidavit as to his citizenship, the possession and working, by himself or grantors, of the claim for which the patent was issued, and the absence of a town site, embracing the land, and of improvements thereon. The fraud alleged is not a specific charge by itself, but is made in connection with the affidavit of the patentee and his procurement of the false affidavits of others. The charges amount to this: that false and perjured testimony was used to influence the officers of the Land Department. There is no allegation of improper conduct on the part of those officers. The answer to this ground of defence is that it is not admissible in an action at law. The validity of a patent of the government cannot be assailed collaterally because false and perjured testimony may have been used to secure it, any more than a judgment of a court of justice can be assailed collaterally on like ground. If a judgment has been obtained by such means, the remedy of

the aggrieved party is to apply for a new trial, or take an appeal to a higher court; and if the testimony was accompanied with acts which prevented him from presenting to the court the merits of his case, or by which the jurisdiction of the court was imposed upon, he may also institute some direct proceeding to reach the judgment. *United States* v. *Flint*, 4 Sawyer, 42; *United States* v. *Throckmorton*, 98 U. S. 61; *Vance* v. *Burbank*, 101 id. 514. Until set aside or enjoined, it must, of course, stand against a collateral attack with the efficacy attending judgments founded upon unimpeachable evidence. So with a patent for land of the United States, which is the result of the judgment upon the right of the patentee by that department of the government, to which the alienation of the public lands is confided, the remedy of the aggrieved party must be sought by him in a court of equity, if he possess such an equitable right to the premises as would give him the title if the patent were out of the way. If he occupy with respect to the land no such position as this, he can only apply to the officers of the government to take measures in its name to vacate the patent or limit its operation. It cannot be vacated or limited in proceedings where it comes collaterally in question. It cannot be vacated or limited by the officers themselves; their power over the land is ended when the patent is issued and placed on the records of the department. This can be accomplished only by regular judicial proceedings, taken in the name of the government for that special purpose.

It does not follow that the officers of the government would take such proceedings even if the charges of fraud and of the use of false testimony in obtaining the patent were true. They might be satisfied that the patentee was entitled to the patent upon other testimony, or, that further proceedings would result in a similar conclusion, and that therefore it would be unwise to reopen the matter. In any event, whether the officers of the government have been misled by the testimony produced before them, or not, the conclusions reached by them are not to be submitted for consideration to every jury before which the patent may be offered in evidence on the trial of an action. As we said in the case of *Smelting Company* v. *Kemp:* "It is this unassailable character [of the pat-

ent] which gives to it its chief, indeed its only, value, as a means of quieting its possessor in the enjoyment of the lands it embraces.    If intruders upon them could compel him, in every suit for possession, to establish the validity of the action of the Land Department and the correctness of its ruling upon matters submitted to it, the patent, instead of being a means of peace and security, would subject his rights to constant and ruinous litigation.    He would recover one portion of his land if the jury were satisfied that the evidence produced justified the action of that department, and lose another portion, the title whereto rests upon the same facts, because another jury came to a different conclusion.    So his rights in different suits upon the same patent would be determined, not by its efficacy as a conveyance of the government, but according to the fluctuating prejudices of different jurymen, or their varying capacities to weigh evidence."    104 U. S. 636, 641.

It remains to notice the defence of estoppel.    The answer of the defendants alleges that Starr, the patentee, was living in Leadville from 1860 until the patent was issued to him in 1879, and was cognizant of the improvements made and of the large sums of money expended on the premises; that he and his grantors fraudulently remained quiet in respect to their ownership of mining claims there, and, from August, 1870, to the time of their application for a patent, never made known, either to the city of Leadville or to the defendants, that he or they claimed a right to any portion of the land; that other parties who made similar claims, and united with him in securing the patent, also stood by and remained quiet; that the defendants expended the sum of $5,000 in making improvements on the premises in controversy under the claim that they constituted part of a town site on the public domain; that there was no mining on the land, and that no notice was given that would lead the defendants to suppose that there had been any mineral location made by him and his associates; that Starr published the notice of his application for a patent only in a weekly paper of Leadville, and that the description of the consolidated claim was so defective that only a skilled engineer could tell where the land was situated; and that after the defendants discovered that the notice of the patent em-

braced lands in the city, they were assured that they should not be disturbed in their possessions, and that only a nominal sum would be demanded from them, not exceeding twenty-five dollars a lot, and that, relying upon said assurance, the defendants continued making improvements.

These allegations are very far from establishing such an equity in the defendants as to estop the patentee and those claiming under him from asserting the legal title to the premises. These matters could not operate to estop the government in any disposition of the land it might choose to make. Its power of alienation could not be affected until the defendants had performed all the acts required by law to acquire a vested interest in the land, and it is not pretended that they took any steps to secure such an interest. Whatever right, therefore, the government possessed to use or dispose of the property, freed from any claim of the defendants, it could pass to its grantee.

The principle invoked is, that one should be estopped from asserting a right to property, upon which he has, by his conduct, misled another, who supposed himself to be the owner, to make expenditures. It is often applied where one owning an estate stands by and sees another erect improvements on it in the belief that he has the title or an interest in it, and does not interfere to prevent the work or inform the party of his own title. There is in such conduct a manifest intention to deceive, or such gross negligence as to amount to constructive fraud. The owner, therefore, in such a case will not be permitted afterwards to assert his title and recover the property, at least without making compensation for the improvements. But this salutary principle cannot be invoked by one who, at the time the improvements were made, was acquainted with the true character of his own title, or with the fact that he had none. *Brant* v. *Virginia Coal and Iron Co.*, 93 U. S. 326; *Henshaw* v. *Bissell*, 18 Wall. 255. It will not be pretended that the defendants did not understand all about the title to the land; they knew that it was vested in the United States. And we must presume that the patentee gave notice of his purpose to acquire it, — such as the law required. The mode and manner of obtaining a patent for mining lands are minutely prescribed

by the acts of Congress. Among other things, the applicant must file his application under them, in the proper land-office, showing a compliance with the laws, together with a plat and the field notes of his claim or claims in common, made by or under the direction of the surveyor-general of the United States, showing their boundaries; and he must also, and previously to the filing of the application, post a copy of the plat, with a notice of his intended application, in a conspicuous place on the land. It is a conclusion, from the issuing of the patent, that this requirement was complied with, and, therefore, it cannot be said here that the patentee did not give notice of his purpose. This notice, as justly observed by the court below, was, of itself, a warning to all who were upon the land and were about to erect improvements upon it, that the patentee was applying for a patent, and thus seeking to obtain the title. And the answer admits that the defendants did ascertain the fact of the application, for they aver a subsequent promise of the applicant to give them a title when the patent was acquired. Under these circumstances the alleged estoppel, like the other matters urged to defeat the action, must fail.

Though the various matters of fraud, perjury, and subornation of perjury, alleged as a defence, are to be taken as true, for the purpose of this decision, they are not to be taken as true for any other purpose. What we decide is, that, if true, they are not available in this form of action, and that any relief against the patent founded upon them must be sought in another way, and by a direct proceeding.

We have thus considered the propositions of law presented by the record, and the matters urged by counsel in his argument, so far as we have deemed them entitled to notice. They disclose nothing which would justify interference with the action of the court below. Its judgment, therefore, is

*Affirmed.*