UNITED STATES v. BIG BEND
TRANSIT CO. et al.
No. 53.

District Court, E. D. Washington, N. D.
Dec. 31, 1941.

462

Lyle Keith, U. S. Dist. Atty., and Hart Snyder, both of Spokane, Wash., and B. E. Stoutemyer, of Portland, Or., for plaintiff.

Post, Russell, Davis & Paine and H. E. T. Herman, all of Spokane, Wash., for defendant.

SCHWELLENBACH, District Judge.

In this action plaintiff seeks to condemn certain lands necessarily flooded by the con-

struction of Grand Coulee Dam. The declaration of taking and the petition were filed December 9, 1939. The lands involved are on the Spokane River a short distance above the confluence of the Spokane with the Columbia River. The declaration of taking divided the property into two tracts. Tract No. 1, consisting of 1971.236 acres, is described as an estate in fee simple absolute. For it there is deposited $32,073.80. Tract No. 2 is described as a flowage easement including all right, title and interest of the defendants in the tract. It is alleged to consist of 721.72 acres for which a deposit of $10,159 was made. Tract No. 1 consists of land on the south side of the river practically all of which was acquired from private ownership. Tract No. 2 consists of lands on the north side of the river and whatever rights to the use of the River for the purpose of the construction of a power dam may have been acquired by defendant from the United States. Judgment on the declaration of taking was entered the day it was filed. Thereafter, and on August 5, 1940, an amended petition was filed in which it was alleged as follows: "That the defendant Big Bend Transit Company, a corporation, claims some right, title or interest in said Tract No. 2, the exact nature of which is to the petitioner unknown, but the petitioner alleges that the said claim of the said defendant is without right and that the said defendant has no right, title or interest therein and that said defendant never had any right, title or interest therein at any of the times referred to in the amended petition in this action. That Stevens County, Washington, claims a lien on said Tract No. 2 for taxes for the year 1940." Plaintiff now contends that defendant has no interest in any lands on the north side of the River, that it acquired no title thereto, and that it acquired no right to the use of the River for the construction of a power dam and that it is not entitled to recover any part of the $10,159.00 which was deposited.

The issue on this phase of the hearing in the case is whether, upon the impaneling of a jury to determine the amount of damages, the Court will submit the question of the value of the property for power site purposes or will limit the jury's consideration to that of the value of the land on the south side of the River and limit the consideration as to the value of such land to its use for agricultural purposes.

By stipulation, the parties agreed that since this question is a mixed question of fact and law and one on which the Court and not the Jury should pass, the testimony should be submitted to the Court and that issue decided prior to the calling of the jury. In hearing this phase of the case, I have assumed the Spokane River to be navigable.

At the outset of the trial, defendant moved to strike plaintiff's amended petition on the ground that a judgment having been entered on the declaration of taking and the term of court having expired, that judgment could not be set aside by the simple procedure of filing an amended petition. The disposition I am making of this phase of the case makes unnecessary any decision on this motion.

■ However, I am firmly convinced that the procedure causing judgments on declarations of taking to be entered by the Court is not only not necessary but it is not the best practice. As I construe the Declaration of Taking Statute, Title 40, Sec. 258a, U.S.C.A., the only thing the Court needs to do is to fix the date on which and the terms on which possession should pass to the Government and to make orders in respect to encumbrances, liens, rents, etc., charges. See Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170; Old Dominion Land Co. v. United States, 4 Cir., 296 F. 20; Id., 269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162; United States v. Threlkeld, 10 Cir., 72 F.2d 464, certiorari denied, 293 U.S. 620, 55 S.Ct. 215, 79 L.Ed. 708; Barnidge v. United States, 8 Cir., 101 F.2d 295.

Defendant's rights are claimed under the Act of Congress approved March 3, 1905, 33 Stat. 1006, which provided as follows:

"*An Act Providing for the acquirement of water rights in the Spokane River* along the southern boundary of the Spokane Indian Reservation, in the State of Washington, *for the acquirement of lands on said reservation for sites for power purposes and the beneficial use of said water,* and for other purposes.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the right to the use of the waters of the Spokane River where the said river forms the southern boundary of the Spokane Indian Reservation may, with the consent of the Secretary of the Interior, be acquired by any citizen, association, or corporation of the United States by appropriation under and pursuant to the laws of the State of Washington."

464

"Sec. 2. That the Secretary of the Interior be, and he hereby is, authorized and empowered to grant such appropriator or appropriators land on said reservation, whether the same has been allotted in severalty to any individual Indians, but which has not been conveyed to the allotee with full power of alienation, or whether the same remains unallotted, on the north bank of the said Spokane River, such as shall be necessary and requisite for overflow rights and for the erection of suitable water, electrical, or power plants, dams, wing walls, flumes, or other needful structures required for the development of power or for the beneficial use of said water: Provided, That no lands shall be granted under this Act until after the Secretary of the Interior is satisfied that the person, association, or company applying has made said application in good faith and with intent and ability to use said lands for the purposes above specified and that it requires the quantity of land applied for in such use, and in case objection to the grant of said land shall be made the said Secretary shall afford the parties so objecting a full opportunity to be heard.

"Sec. 3. That the compensation to be paid for said land by said applicants shall be determined in the manner prescribed in section three of the Act of March second, eighteen hundred and ninety-nine, entitled 'An Act to provide for the acquiring of rights of way by railroad companies through Indian reservations, Indian lands, and Indian allotments, and for other purposes.' * * *"

In conformity therewith, the Secretary of the Interior, on September 29, 1905, promulgated the departmental regulations. Sec. 5.

On July 27, 1909, defendant filed its first application to secure from the Secretary of the Interior the rights to the use of the waters of the Spokane River and the grant necessary and requisite for overflow rights and for the erection of a suitable 60 foot dam for the development of power at the point here involved. That application was studied by several Bureaus in the Department. The granting of it was vigorously opposed by the Director of Geological Survey and on July 29, 1911, the Secretary notified the Company that, at that time, he would not pass upon the application. He pointed out that he would want the application amended so as to provide for a higher dam in order to make full use of the power potentially capable of development at the

site. But the real basis of his refusal was that he did not like the 1905 Act and was hopeful that additional legislation might be adopted by Congress. (Hereafter the Secretary of the Interior will be referred to as the Secretary.)

As a result of the Secretary's letter, further efforts by defendant until November, 1913, to acquire rights under the 1905 Statute consisted of considerable engineering work performed for the defendant by its chief engineer, H. L. Russell, and surveys and studies made by independent engineering firms. On March 8, 1914, defendant filed with the Secretary further application in which it proposed to build an 80 foot dam. After consideration in the Department, it was decided to require of the defendant the filing of a surety bond in the sum of $10,000 conditioned that the defendant would make the necessary surveys to determine the amount of land required to be acquired for overflow purposes for a dam 80 feet in height which would lie below an elevation of 1192 feet above mean sea level according to the datum of the United States Geological Survey, that it would file its amended applications within six months from the date of the approval of the bond, that it would construct the hydroelectric power project within five years after the application for the grants had been approved and that it would pay for the lands granted a reasonable value thereof as assessed under the direction of the Secretary of the Interior. This bond was approved and filed on August 5, 1914. Thereupon Russell conducted a survey in an effort to ascertain the amount of land necessary to be acquired. Maps were prepared. The application and the maps were filed December 19, 1914. This application was studied by the Geological Survey, the Bureau of Indian Affairs and the office of the Secretary. In 1915, prior to the granting of the application, defendant paid to the Government the amount fixed as the appraised value of the lands acquired.

On April 7, 1916, the Secretary, in a memorandum to the President, recommended that the President approve the modification of the power site reserve orders of October 4, 1910, and of July 29, 1911, so as to permit the approval of defendant's application. On April 11, 1916, President Wilson approved the modification. On April 13, 1916, the Secretary granted the application of defendant and approved the maps insofar as they referred

to his statutory authority under the Act of March 3, 1905.

In the meantime, it was discovered that, apparently by accident, in an Act approved August 1, 1914, 38 Stat. 584, the Congress had repealed the right of the Secretary to sell the lands on the south side of the River which had been previously used as a military reservation. Consequently, on March 13, 1916, legislation was introduced to reinstate that right. The record discloses that that legislation had the support of the two Senators from the State and the Congressman from this District, that the Department supported the legislation and that, at a meeting of the Senate Committee on Indian Affairs attended by the members of the House Committee on Indian Affairs, the entire history of this project was explained in all of its details by a representative of the Interior Department. The legislation became law on May 18, 1916. On August 17, 1916, the Secretary approved the map covering the lands in the abandoned military reservation under his authority in the Act of May 18, 1916, 39 Stat. 123.

Within six months thereafter, before the beginning of construction, diplomatic relations with Germany were severed and then war was declared. In 1918, the defendant presented to the Department its situation explaining the impossibility of the construction of the dam under war conditions and asserting that it would be impossible for defendant to complete the structure within the five-year period designated in the bond. The Department's response to this petition was to advise defendant to wait until the five-year period had just about expired before renewing the application. That advice was accepted and it was not until the spring of 1921 that the question was presented to the Department. By that time, defendant came to the conclusion that, if it were to finance the project, it would be necessary for it to have some more satisfactory evidence of its title. This question was debated at great length in the Department and at one time an opinion was rendered by an Assistant Secretary of the Interior approving of the issuance of patents to these lands. However, after the matter had reached the desk of the Secretary and he had studied it he, on March 10, 1923, reversed the decision of the Assistant Secretary, held that he construed the 1905 Act to be analogous to the Acts of Congress granting authority for the acquisition of rights of way by railroad companies through Indian reservations stating specifically "such right is a limited fee on an implied condition of reverter in the event the grantee ceases to use or retain the land for the purpose indicated in said Act of 1905 * * * the termination of which right of way or limited fee is not fixed in the Secretary of the Interior but may be effected upon good cause being shown only through proceedings had without the jurisdiction of the Department of the Interior."

Thereupon defendant asked for an official map which could be recorded with the County Auditor. As a result of this proposal, it was agreed that two cadastral engineers in the employ of the General Land Office would proceed to the ground for the purpose of checking the Russell survey and for the purpose of making an official survey. That work commenced in October, 1923. As a result of it, it was discovered that the Russell survey was inaccurate and that the map which purported to depict a contour line 1,192 feet above mean sea level had not depicted such line and that a complete re-survey was necessary. The question of the inaccuracy of the Russell survey was the subject of most of the testimony at the trial and I will discuss that later. Concededly, however, regardless of the skill or lack of skill of the Russell survey, it would have been approximately 15 feet in error because the initial point of the survey was tied to a bench mark inaccurately placed upon the property in 1911 eighty feet above the river level and not ninety-five feet as was intended. This bench mark was placed by an engineer of the United States Geological Survey.

Constant negotiations back and forth between defendant and the Department occurred during the years 1924 and 1926 inclusive. At defendant's expense a re-survey was made and maps prepared. On September 11, 1926, an application for corrected grants was made. On November 18, 1926, a bond to secure the payment by the defendant to the Government for the additional lands necessarily acquired as a result of the re-survey was executed and on February 19, 1927, the Secretary issued the corrected grant.

From time to time, during all of these delays, the original bond of August 8, 1914, was continued in force by the filing of consents to its continuation by the surety. That bond was finally released on February 18,

1933, by the payment to the Government by the defendant of the amount of its penalty. In the meantime, plans for the development of Grand Coulee had progressed to a point where it became certain that the construction of that project would flood the area involved herein. Consequently, nothing was done from that time until the date of the commencement of this action. The testimony is uncontradicted that the defendant paid to the Government for the lands acquired from the Government $32,-630.79. It is also uncontradicted that the defendant paid to private owners the sum of $129,843.02. The testimony of the President of the Company to the effect that the Company had spent $99,000 for various surveys, engineering expenses and other expenses with reference to the project is uncontradicted. From 1929 to 1939, defendant paid to the State of Washington the total sum of $4,900 in water right taxes, under a statute passed in 1929.

The position of the defendant is that it is entitled to receive just compensation for this property upon the basis of its use for dam-site purposes and it relies upon the doctrine of equitable estoppel. It contends that this case is controlled by Monongahela Navigation Company v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463; Greenleaf-Johnson Lumber Company v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939; Lindsey v. Hawes, 2 Black 554, 67 U.S. 554, 17 L.Ed. 265; Walker v. United States, C.C., 139 F. 409. Plaintiff attacks defendant's position from all sectors on every front. These points will be discussed later.

It should be noted at the outset that this is not an instance where a corporation surreptitiously obtained a valuable right by any ex-parte proceedings such as plaintiff refers to in its brief. There is no evidence of base practice or deceit. Defendant did not deal with only one Secretary of the Interior or with one group in the Department of the Interior. The matter was handled in the Department under every Secretary of the Interior from the administration of President Taft to President Hoover. Every substantial question raised by plaintiff was debated and discussed within the Department of the Interior and decided adversely to plaintiff's position here. The Director of the Geological Survey was at all times opposed to the 1905 Act. Some of the points raised by the plaintiff were raised by him as far back as 1911, I am convinced after careful reading of the dozens of exhibits that, as far as this transaction is concerned, the Secretaries and officials of the Department of the Interior were conscientiously and consistently attempting to protect the rights of the public and of the Government in every step of the proceedings.

■ As will be seen from this opinion, plaintiff repeatedly attacks the interpretations placed on the Act by the successive Secretaries of the Interior. Such interpretations are not conclusively binding upon the Court. If they are clearly contrary to the congressional intent, that intent prevails. However, it is the duty of the Court to respect the appropriate integrity and independence of the administrative agency. United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429. The department's interpretations are entitled to the highest respect. Logan v. Davis, 233 U.S. 613, 34 S.Ct. 685, 58 L.Ed. 1121; Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457; United States v. Minnesota, 8 Cir., 113 F.2d 770. The commission by Congress of the execution of its policy to the specialized personnel of a department is a familiar practice. United States v. Johnston, 124 U.S. 236, 8 S.Ct. 446, 31 L.Ed. 389; Northern Pacific Railway Company v. McComas, 250 U.S. 387, 39 S.Ct. 546, 63 L.Ed. 1049; Passavant v. United States, 148 U.S. 214, 13 S.Ct. 572, 37 L.Ed. 426; Bates & Guild Co. v. Payne, 194 U.S. 106, 24 S.Ct. 595, 48 L.Ed. 894. There is no difference in the skill of employees in a division of a department and those in a board, commission or administration. Gray v. Powell et al., 62 S.Ct. 326, 86 L.Ed. ——, Decided Dec. 15, 1941. The findings of a department are binding on the Court if they are the result of fair consideration and had a basis in substantial evidence. Shields v. Utah Idaho Central Railroad Co., 305 U.S. 177–185, 59 S.Ct. 160, 83 L.Ed. 111. Where a determination has been left to an administrative body, the delegation will be respected and the administrative conclusion left untouched. Gray v. Powell et al., supra.

■ The purpose of the 1905 Act was plain and apparent upon its face. It did exactly what the title to the Act said it did. It provided for the acquirement of water rights of the Spokane River along the southern boundary of the Spokane Indian Reservation and for the acquirement of lands on the said reservation for sites for power purposes. It gave to the Secretary

of the Interior the right to grant the use of water of the Spokane River for the purpose of developing hydroelectric power. The plain intent of the Act was buttressed by the legislative record. The Report of the Committee on Indian Affairs in the Senate (58th Congress, 3d Session, Report #4378) shows that that Committee so construed it and that the Department of the Interior so construed it. The explanation by Congressman Jones before the House (Congressional Record Vol. 39, part 3, p. 2413, 58th Congress, 3d Session) further supports this plain import of the Act. By its regulations under the Act and by innumerable interpretations of it since, the Department of the Interior has so construed it.

■ That the Congress had the power to pass this Act cannot seriously be disputed. The water of the Spokane River and the bed of the stream to the south bank thereof were included in the Spokane Indian Reservation by Executive Order of January 18, 1881. The State of Washington specifically disclaimed all title to all lands held by any Indian or Indian Tribes provided that the Indian lands should remain under the absolute jurisdiction and control of the Congress. Enabling Act, Rem.Rev.Stats. of Wash. Vol. 1, pp. 332, 333, 25 Stat. 676, 677, sec. 4, par. 2; United States v. Ferry County, Wash., D.C., 24 F.Supp. 399.

■ The United States had the right to grant for appropriate purposes title or rights in the lands below the high water mark. United States v. Stotts, D.C., 49 F. 2d 619. The power of the Government to reserve the waters and exempt them from appropriation under the state laws cannot be denied. United States v. Rio Grande Dam & Irrigation Company, 174 U.S. 690, 702, 19 S.Ct. 770, 43 L.Ed. 1136; United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089; Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340; United States v. Walker River Irr. Dist., 9 Cir., 104 F.2d 334. The granting of the right to defendant by means of approval of the applications and the maps constituted a conveyance of title as effectively as if it had been by the issuance of a formal patent. Shaw v. Kellogg, 170 U.S. 312, 18 S.Ct. 632, 42 L.Ed. 1050.

■ Plaintiff contends defendant acquired no right under the 1905 Statute because it did not first secure the consent of the Secretary prior to becoming an appropriator under the state laws. Plaintiff argues that there should have been two applications, the first for consent of the Secretary to appropriate water and the second the application to acquire the right to the water. A review of the regulations promulgated by the Secretary on September 29, 1905, shows that the Department did not so construe the Act. There can be no doubt, on the reading of the regulations, but that they contemplated but one application and but one approval by the Secretary. Congress had the right to delegate such authority to the Secretary to make regulations and such regulations become effective with the force of law. Light v. United States, 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563; Utah Power & Light Company v. United States, 243 U.S. 389, 410, 37 S.Ct. 387, 61 L.Ed. 791.

Furthermore, this precise question was presented to the Secretary by the Director of Geological Survey in his letter of May 29, 1911, and his memorandum of July 18, 1911. Thereafter, on July 29, 1911, the Secretary having before him the argument presented by the Director, tentatively denied the application of defendant in a letter discussing general policy of the Act which concluded: "I recognize the fact that your Company is fairly entitled, in case anyone is given such rights as you now apply for, or is given rights under further legislation by Congress, to be preferred to the giving of such rights over other applicants." In addition to that, the Secretary, when he made his corrective grant of February 19, 1927, made the following finding: "And whereas the Secretary of the Interior has heretofore given his consent to acquisition by the said The Big Bend Transit Company to the right to the use of the waters of the Spokane River for power purposes under and pursuant to the laws of the State of Washington where the said River forms the southern boundary of the Spokane Indian Reservation as provided in Section 1 of the said Act of 1905."

■ The plaintiff insists that I should assume that such finding, using the word "heretofore" meant subsequent to 1920, or at least that I cannot assume that it meant prior to 1920. It isn't necessary for me to make any assumption whatsoever. The facts as disclosed in the records of the Department are before me. Those records were available to both parties and counsel

for both parties have stated that they have put into evidence in this case every document in that record which they considered pertinent to the decision of the case. The record conclusively shows that when the Secretary, in 1927, used the word "heretofore," he meant prior to the granting of the application in 1916.

Plaintiff's next contention is that defendant never was an appropriator of the waters under the laws of the State of Washington. This contention also runs counter to the Secretary's finding of 1927. The controlling statute is found in the Laws of Washington of 1891, Ch. 142. The 1891 Statute provided for the appropriation of water for irrigation, mining and manufacturing purposes by the posting of notices and the filing for record at the office of the County Auditor of copies of such notices. This Statute is admittedly defective because, in Section 8 thereof, it provided that sections referring to the posting and filing of notices only applied to appropriations of water for irrigation purposes. Section 9 provided that water appropriated for any of the purposes mentioned in the Act might be changed to any other purpose therein specified, or in any other beneficial use the right to such use shall relate back to the original appropriation. The record is clear that the defendant meticulously and carefully attempted to comply with the provisions of this Statute. Notices were posted and filed for appropriation for both irrigation and power purposes. At the time of the granting of the application in 1916 and within six months prior thereto, the defendant had posted and filed complete notices as required by this Act. The plaintiff asks me to construe the 1905 Act so as to require the defendant to have appropriated waters prior to 1916 by using it to create hydroelectric power. Such a construction would be destructive of the purpose of the Statute. One cannot use water to create hydroelectric power without the construction of a dam. No person would be entitled to construct a dam under the 1905 Act until he had first appropriated the water. Consequently, no person could ever have qualified under plaintiff's construction of the Act. The cardinal principle of statutory construction is to save and not destroy. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

Plaintiff's alternate contention is that defendant should have constructed "a ditch with its head in the bed of the stream and its bottom low enough so that the waters of the stream would flow into the ditch by gravity." That is, that the defendant should have taken the water out and run it along the shore for awhile and then emptied it back. I cannot accept such a construction of the 1905 Act. The law does not require the doing of useless acts. Legislation should not be read in such a spirit of mutilating narrowness. United States v. Hutcheson et al., 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788. The Court should view an act of Congress with the idea of giving hospitable scope to its purpose. Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 391, 59 S. Ct. 516, 83 L.Ed. 784.

It seems to me that the 1905 Act must be construed in the light of the ambiguities of the Washington State Statute and the decisions of the Washington Supreme Court.

The real question is whether the actual diversion of water was a condition precedent to appropriation. The State Supreme Court has held otherwise. "The right to use the water is the essence of appropriation. The means by which it is done are incidental." Offield v. Ish, 21 Wash. 277, 57 P. 809, 810. In determining the intention to appropriate water, the fact of acquiring the right to the land, the person's residence thereon and the cultivation of the soil as well as the use of the waters are all factors in inferring the intent to appropriate. Longmire v. Smith, 26 Wash. 439, 67 P. 246, 58 L.R.A. 308. Appropriation of water consists of an intention to appropriate followed by reasonable diligence in applying the water to a beneficial use. Sander v. Bull, 76 Wash. 1, 135 P. 489; In re Alpowa Creek, 129 Wash. 9, 224 P. 29. The appropriator of water may apply the water to any beneficial use he chooses and in changing from one use to another he does not in any way lessen his rights or forfeit his priority. In re Alpowa Creek, supra. An appropriator's rights date back to the beginning of the work and not from the date of actual diversion when the work has been pursued with reasonable diligence. Hunter Land Company v. Laugenour, 140 Wash. 558, 250 P. 41. That includes the survey necessary prior to the beginning of construction. Sumner Lumber & Shingle Company v. Pacific Coast Power Company, 72 Wash. 631, 131 P. 220; Kinney on Water Rights, Vol. 2, 2nd Ed., p. 1293.

Regardless of what may be said about the defendant's conduct after 1916, no one can read the Interior Department record and conclude that defendant was anything but diligent between 1909 and 1916. It had engineering studies made. It had surveys made. It regularly filed its notices in conformity with the 1891 Statute. It pursued its application before the Department assiduously.

The question as to what is "reasonable diligence * * * must depend to a large extent upon circumstances. * * * The law does not require an immediate use. The doctrine of common sense applies. In making the appropriation, intention is an important factor." In re Alpowa Creek, supra, [129 Wash. 9, 224 P. 31].

Almost precisely the same position as plaintiff takes here was taken by the appellant in the case of Grant Realty Company v. Ham, Yearsley & Ryrie, 96 Wash. 616, 165 P. 495, 499. The following from the Court's opinion succinctly states the problem and the answer to it:

"But appellants argue that respondent is trying to occupy two inconsistent positions: First that the right to condemn exists because of the initiated water right; and, second, that the water right is perfected by the exercise of the right to condemn. We fail to see the inconsistency. Under the statute, the right to take the water as against a subsequent appropriator does depend in terms upon the initial notice of appropriation through the rule of relation. That is to say, the actual taking relates back to the original notice so as to defeat intervening appropriations of the same water. Such is the express declaration of the statute. Section 6319. If therefore the prime physical essential for the taking, namely, a site for diversion works, can only be acquired by condemnation, the final perfection of the water right so as to attach by relation as of the date of its initiation is essentially and necessarily dependent on the exercise of the right to condemn. This is not only a self-evident fact, but it is recognized by another section of the statute itself, Section 6329, which gives to the owner of nonriparian land the right to condemn for right of way for any ditches, canals, and works necessary to divert and convey the water to his lands. It must not be forgotten that the very purpose of the statute is to abolish the doctrine of riparian rights by giving effect to the doctrine of relation through diligence in construction in favor of the owner of nonriparian land as well as the owner of riparian land. Equality of rights can only be attained by an equality of means. When this fact is clearly grasped, the two propositions, that the right to condemn exists because of the initiated water right and that the water right is perfected through the exercise of the right to condemn, are plainly not only perfectly consistent, but their existence in correlation is inevitable in every case where condemnation is necessary to the completion of the enterprise. * * *

"So long as the condemnation suit is prosecuted with reasonable diligence, then, however long it may take to complete the condemnation, the rights of the parties to the water must be measured as of the date when the condemner posted and filed his notice of appropriation, else the doctrine of relation can never exist where condemnation is necessary."

The prosecution of an application before the Secretary under the 1905 Act is so closely analogous to the prosecution of the condemnation proceedings as to leave no doubt that the Grant Realty case is controlling here.

Plaintiff argues that defendant's rights under the 1916 grant expired at the end of five years for the reason that the bond was conditioned that the project should be completed within five years. This precise question was passed upon by the Secretary on April 8, 1921, in a letter to Senator Poindexter. This was the language used: "As to the power project, there is no substantial clause in the Act of March 3, 1905, which can be invoked, and failure on the part of the Company to perform the conditions of the bond abovementioned would not affect its grant in any way but merely cause the Company to become liable for the principal sum of the bond." It is clear to me that such a ruling was inevitable. When the Government requires a bond, it must look exclusively to the penalty of the bond. It cannot accept the penalty and, at the same time, contend the rights of the defendant were automatically cancelled because of the failure of the Defendant to perform the conditions of the bond.

Plaintiff next contends that the approved maps of 1916, as prepared from the Russell survey, were so grossly inaccurate as to result in an instrument which was void. The defendant admits that the

Russell survey was inaccurate. The fact that such an additional amount of overflow land was found necessary as a result of the 1926 survey demonstrates this. That fact does not void the 1916 grant, however. It is clear from the application and the correspondence that the intent of the parties was at all times ascertainable by means of an accurate survey. The crest of the dam was to be 1179 feet above sea level. The place of location of the dam was agreed upon. It was determined by plaintiff's engineers that the construction of the dam at that place would require the acquisition for overflow purposes of all the shore lands upstream to the power site owned by the Washington Water Power Company in Sec. 15, Twp. 27 N.R. 37 E.W.M., which were below 1192 feet above mean sea level.

That being true, this case comes within the well-recognized rule that when the description in a conveyance is erroneous that is conveyed which is intended to be conveyed rather than that which is described. As the Supreme Court said in The Heirs of Higueras v. United States, 5 Wall. 827, 835, 72 U.S. 827, 18 L. Ed. 469: "But ordinary surveys are so loosely made, and so liable to be inaccurate, especially when made in rough or uneven land or forests, that the courses and distances given in the instrument are regarded as more or less uncertain, and always give place, in questions of doubt or discrepancy, to known monuments and boundaries referred to as identifying the land."

The general rule is that in matters of boundaries calls for natural objects and fixed monuments control those of distances. Security Land & Exploration Company v. Burns, 193 U.S. 167, 24 S.Ct. 425, 48 L.Ed. 662; Silver King Coalition Mines Company v. Conkling Mining Company, 255 U.S. 151, 41 S.Ct. 310, 65 L.Ed. 561; United States v. Redondo Development Co., 8 Cir., 254 F. 656; Watkins v. King, 4 Cir., 118 F. 524; United States v. State Investment Company, 264 U.S. 206, 44 S.Ct. 289, 68 L.Ed. 639. It is the duty of the Court to ascertain the intention of the parties deduced from the composite of all the evidence. Fordson Coal Co. v. Wilson, 6 Cir., 39 F.2d 55; Hamm v. City of San Francisco, C. C., 17 F. 119. When the surveyor is mistaken as to the courses and distances, the Court must reconcile the conflicting calls so as to establish the true location. United Thacker Coal Co. v. Red Jacket, Jr., Coal Co., 4 Cir., 232 F. 49.

Here we have a case where the conveyance is in the nature of a right of way evidenced by the application and the approval of the map. The granted application clearly called for all land below contour line of 1192. That is what the defendant sought and that was what the Government granted. The intent of the parties was the subject of definite ascertainment. The errors in the map, whether due to the fault of the Government or the defendant, did not detract from the legality of the grant.

Of course, if the Russell survey was so grossly inaccurate and showed such careless disregard of engineering requirements as to prove lack of bona fides in defendant's 1914 application, then the foregoing rule would not save it. That is the position of plaintiff. Most of the time of the testimony was taken in attempting to prove it. The argument is made that the mere size of the additional acreage necessary to the grant proves it.

At the threshold of this point plaintiff is met with the undisputed fact that a certain portion of the error was due to the mistake in the United States Geological Survey datum. Russell's task was to survey a contour line 1,192 feet above mean sea level, U.S.G.S.Datum. Concededly, the bench mark placed by the Geological survey engineer nearby was 15 feet too low. A 15 foot vertical error would make no difference in the lands required if the survey was conducted along the side of a sheer vertical cliff. It would make a very great difference where the survey was conducted on a gradual sloping area. The length of this survey was 14 miles. It covered land with wide variations in topography. Having this in mind, I pointed out to plaintiff's counsel during their opening statement the necessity, as I saw it, of proving the substantial character of the effect of the Russell errors. The result of these errors had to be separated and differentiated from the results of the initial error. There is nothing in the testimony that meets this requirement.

To prove this point, plaintiff called two witnesses. One was the cadastral engineer Pecore who, in 1923, made the check survey for the General Land Office. The other was an Engineer Butler, an employee of the Reclamation Service at Grand Coulee. He attempted to reconstruct the closures on the Russell survey as depicted on the map by tying them into known sec-

tion corners, quarter section corners and meander corners.

I hesitate to discuss the testimony of these two men for fear what I say might be construed as reflecting on their ability in their profession. Such is not the case. I was impressed with their ability and sincerity. One could not hear the testimony of the experts on both sides of this case, however, without concluding that, so far as this kind of surveying is concerned, the science of engineering is not as precise as it is generally thought to be. In the trial, the cross examiners triumphed on both sides.

The fact is that both of plaintiff's witnesses faced impossible tasks. Pecore went out there in 1923 without Russell's original field notes. He had a blue print of a blue print to use for checking purposes. The figures as to courses and distances were indistinct. For example, on the line from the point of beginning to the first station, the figure was so indistinct that he misread the course by 1 degree which threw him off 3½ feet. He had no transit level, but used an uncertain instrument called a clinometer. The terrain was rough, rocky and exceedingly difficult to survey. It did not detract in the slightest from my respect for his ability when he was compelled to admit numerous errors in his calculations. But he certainly did not prove that the differences between the 1914 and the 1926 surveys were due to Russell's careless inaccuracies rather than the basic 15 foot error in the U.S.G.S.Datum.

Mr. Butler had an equally impossible problem. He tried to prove the seriousness of Russell's errors by using the General Land Office procedure of checking township surveys through errors of closure around sections. He never had done General Land Office cadastral work. He showed no familiarity with land office practice. He used a manual which was not in use until 5 years after the Russell survey. I was convinced from the testimony of the Land Office engineer who later testified that the use of the method pursued by Mr. Butler in checking the Russell survey was of no probative value in this case. I might discuss this engineering testimony indefinitely. It took a full week to present it. I might point out each of the errors of plaintiff's witnesses disclosed in cross examination. I do not think such detailed discussion is necessary. I was convinced when the evidence was in that Russell had made errors.

But there simply was no proof as to how serious they were and to what extent they contributed to the necessity for acquiring additional land. That being true, the rule as to the intent of the parties must stand.

■ The plaintiff's next contention is that, with the adoption of the Federal Power Act June 10, 1920, 41 Stat. 1063, 16 U.S.C.A. § 791 et seq., the Act of March 3, 1905, was repealed and everything done thereafter was illegal or void. Plaintiff's argument upon this point is based exclusively upon the repealing clause of the Power Act. Plaintiff's counsel refused even to discuss that portion of section 23 of the Power Act which reads as follows: "That the provisions of this Act shall not be construed as affecting any permit or valid existing right of way heretofore granted, or as confirming or otherwise affecting any claim, or as affecting any authority heretofore given pursuant to law, but any person, association, corporation, State, or municipality, holding or possessing such permit, right of way, or authority may apply for a license hereunder, and upon such application the commission may issue to any such applicant a license in accordance with the provisions of this Act, and in such case the provisions of this Act shall apply to such applicant as a licensee hereunder." They argued that I must disregard Section 23 because they deny that on June 10, 1920, this defendant had any valid existing right of way which had theretofore been granted or any claim or any authority theretofore given pursuant to law. Since I have held that on June 10, 1920, defendant did have a valid and existing right of way and a claim of authority theretofore given pursuant to law, it follows necessarily that that right of way grant or authority was not affected by any of the provisions of the Power Act. That is the construction which was placed upon it by each of the Secretaries of the Interior thereafter appointed with the exception of Secretary Fall who did not pass upon it. When Dr. Work signed the corrective grant in 1927, this precise question was presented to him by the Commissioner of Indian Affairs and he had the benefit of the opinion of the Solicitor for the Department of the Interior dated February 16, 1927. The pertinent portions of that opinion are as follows:

"It is my opinion that the provisions of section 23 just quoted are applicable to the instant case. The Department has held in

its unpublished decision of May 10, 1923, already referred to, a copy of which is. to be found with the papers in the file, that the act of March 3, 1905, is one which grants a right of way, and has likened that act in that respect to the general Power Act of February 15, 1901 (31 Stat. 790 [16 U.S.C.A. §§ 79, 522, 43 U.S.C.A. § 959]). I am in accord with the statements made in that decision.

"The interest of a grantee in a right of way vests upon the approval of the map illustrating its location. In the case at hand The Transit Company's map was approved on April 13, 1916, as to the Spokane Indian Reservation, and on August 17, 1916, as to the abandoned Fort Spokane Military Reservation. In my opinion The Transit Company had a "permit or valid existing right of way," at June 10, 1920, which was not and is not affected by the Federal Water Power Act, inasmuch it clearly appears that it was the intention of the Government and of The Transit Company that the right of way should include all the land below the 95-foot contour above low water elevation; that the approved map erroneously represented the limits of the right of way; and that this is a proceeding to correct that error and to ascertain what, if any, additional compensation should be required of the company because of the increased area of the tract appropriated and intended to be conveyed."

Indirectly, this question was presented to the Interior Department in 1932. Ironically enough, then it was presented by a young lady who was an attorney for the defendant in New York. She wanted to avoid the payment of the $10,000 bond penalty on that ground. But the office of the Secretary of the Interior said no. The penalty of the bond must be paid and it was paid.

Plaintiff says that any opinion or any determination that may have been made by the respective Secretaries of the Interior since June 10, 1920, were ineffectual because, on that date, all jurisdiction. was removed from the Interior Department. When plaintiff thus argues, it simply begs the question. I am firmly convinced that the Power Act did not repeal the Act of March 3, 1905, and that under section 23 of the Act all of the rights of the defendant were retained.

· Plaintiff argues that, because in the corrective grant of February 19, 1927, the Sec-retary used the words "to the extent and for the purposes the Secretary of the Interior is authorized to grant the same under the said Act of March 3, 1905," the Secretary was in doubt as to his authority to make the corrective grant and that such doubt was based upon the fact that the Federal Power Act might have taken away from him his authority. The record clearly belies this conclusion. The Secretary had before him the unequivocating opinion of his legal adviser who had squarely passed upon this precise question. Any fair reading of the record consisting of the memoranda, letters, reports and opinions of the Department will convince anyone that the reason the Secretary used that particular language was because of the question which he discussed in his letter of May 10, 1923, in which he construed the 1916 granting of the application and the approval of the maps as being a grant of right of way which made it unnecessary and improper for him to issue a patent to the lands involved. He said this: "I find the applicable law of March 3, 1905, to be neither the direction or specific authority for the issuance of patent." I have not the slightest doubt it was because of that opinion that he used the language in 1927 to which the plaintiff points.

Plaintiff urges that because of the fact that in the case of. United States v. Chandler-Dunbar, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063, and in the United States v. Appalachian Electric Power Co., 311 U. S. 377, 61 S.Ct. 291, 307, 85 L.Ed. 243, the statement is made but "that the running. water in a great navigable stream is capable of private ownership is inconceivable," the defendant should not be entitled to claim a perpetual right to the use of the water and the power inherent therein. I do not understand that the defendant is so claiming. The defendant is claiming here that on December 9, 1939, it had what the Secretary on May 10, 1923, declared it had; i. e., "a limited fee on an implied condition of reverter in the event the grantee ceases to use or retain the land for the purpose indicated in the Act of 1905, the termination of which right of way or limited fee is not vested in the Secretary of the Interior but may be effected upon good cause being shown only through proceedings had without. the jurisdiction of the Department of the Interior." To my mind, that administrative interpretation of the

Act is the only reasonable and proper interpretation. Had he ruled otherwise, he would have come within the sphere of attempting to exercise arbitrary power condemned in Garfield v. United States ex rel. Goldsby, 211 U.S. 249, 262, 29 S.Ct. 62, 53 L.Ed. 168. In view of the fact that in reliance upon that interpretation defendant expended a large sum of money, plaintiff cannot here in this proceeding brought as a consequence of the Fifth Amendment to the Constitution which requires the payment of just compensation for private property taken for public use, set aside the right of the defendant without compensation therefor. Kern River Company v. United States, 257 U.S. 147, 42 S.Ct. 60, 66 L.Ed. 175. This would amount to a collateral attack on the title acquired by defendant. Such an attack is not permissible. Steel v. St. Louis Smelting & Refining Co., 106 U.S. 447, 1 S.Ct. 389, 27 L.Ed. 226; Sioux City & St. Paul Railroad Company v. United States, 159 U.S. 349, 16 S.Ct. 17, 40 L.Ed. 177; United States v. Coronado Beach Company, 255 U.S. 472, 41 S.Ct. 378, 65 L.Ed. 736.

Counsel for plaintiff in his brief admitted that if the state or county or if some other party were plaintiff in this case it could not collaterally attack the acts of the Secretary but argued that since it is the Government which is commencing this action that it is entitled by a sort of double-barrelled action to set aside defendant's rights and, at the same time, to proceed with condemnation. Plaintiff cites a number of cases where title to real estate has been an issue in condemnation proceedings. Those cases are not in point here. They are cases which would be in point if I had held that defendant had no right, title or interest in this property. However, here we have a defendant which, up to December 9, 1939, had a right granted to it by two Acts of Congress and by the Secretary of the Interior. It was not a perpetual right. It was one that could be taken away from it under certain conditions but only by an action by the Government for that purpose alone.

Plaintiff argues that such a ruling merely results in duplication of litigation costs. There is a very fundamental reason why such a ruling must be made. It is because of the complete difference in the nature of the action to set aside the grant as compared with the nature of this action. An action to set aside the grant would be one in equity. The Court would be entitled to consider the equities as between the parties. The Court in such an action could very well lay down the terms under which the grant could continue. It could say that unless construction was started within six months, the grant would revert. This action is entirely different in its character. I have only one problem and that is to decide what this defendant owned on December 9, 1939. It either owned this grant or it did not own it. A proceeding of this kind is no place in which to collaterally attack the grant made by the Government.

Furthermore, plaintiff in its pleadings does not seek to set aside any right which defendant may have in this property as contemplated by the Secretary in his opinion on March 10, 1923. Plaintiff might possibly have so contended under its original petition. But it abandoned any chance of so claiming by its amended petition. It alleges that "the claim of said Defendant is without right and that said Defendant never had any right, title or interest therein at any of the times referred to in the amended petition in this action." The prayer of the petition does not ask for any adjudication of reversion. It simply asks that defendant be barred from asserting any claim. This being true, all of plaintiff's argument on this point fails.

■ Plaintiff contends that because, in the testimony of Mr. Plummer, who made the purchases of the private lands on the south bank of the River, he said that the drafts for payments were drawn on the parent corporation in New York, that that is proof that the defendant didn't pay the $129,843.02 for the property. There was nothing in the cross examination of Mr. Plummer to indicate any such thought in the mind of plaintiff's counsel. It was not until after the case had been closed for at least ten days and the brief was filed that any suggestion of such a theory was presented. No suggestion was made that the defendant present proof of the actual fact which I have no doubt was that the parent corporation in New York charged the items against its subsidiary and that the subsidiary either paid the money to the parent corporation or owes it. The testimony is undisputed that defendant acquired title to this property and I am not going to assume that it got it by a donation.

Under the same circumstances, plaintiff argues that because Mr. Nicholls, the President of the defendant corporation, used the language "I had spent $69,000 and my associate paid $30,000" that I am to assume that those figures were donations. I will make no such assumption. Counsel at the trial of a law suit have some responsibility to the Court, if not to the opposition, to try the case with the cards on the table.

██ Plaintiff attacks defendant's claim of the right to rely upon equitable estoppel by the citation of a number of cases. These cases uniformly hold that where the officer or agent of the United States enters into an agreement or an arrangement to do or cause to be done what *the law does not sanction or permit,* it cannot create equitable estoppel as against the Government. For example, in the case of the Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 391, 61 L.Ed. 791, the arrangement made was alleged to have been made with "some unmentioned officers or agents of the United States to the effect that the reservations would not be an obstacle to the construction or operation of the works in question." The Court said: "Of this, it is enough to say that the United States is neither bound or estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done *what the law does not sanction or permit."* (Emphasis mine) The same language was used by Mr. Justice Black in the case of United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 757, 84 L.Ed. 1050: "As to estoppel, it is enough to repeat that '* * * the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done *what the law does not sanction.'* " (Emphasis mine) In the San Francisco case, in direct violation of the plain mandate of Congress, the Department of the Interior, by its silence, acquiesced in the sale of Hetch-Hetchy power to a private company. None of the cases cited by plaintiff are in point. Here the acts of the Secretaries of the Interior were in strict conformity with the will of Congress as expressed in two separate Acts of Congress. Relying upon the Acts of Congress, and the grants issued to it under such Acts by the administrative officer designated in the Acts to make such grants, defendant expended something in excess of $250,000. Clearly the plaintiff is estopped to question the validity of those grants.

This is a stronger case than the case of Monongahela Navigation Company v. United States, supra. There the invitation extended to the Company by the Congress consisted merely of making certain of its appropriations contingent upon the construction by the Navigation Company. In the case of United States v. Denver & R. G. W. R. Co., 8 Cir., 16 F.2d 374, the estoppel was created by the silence upon the part of the Secretary of the Interior.

 Plaintiff makes the point that defendant cannot claim estoppel because of the long delay and the fact that it never actually constructed the dam or power house. There has been a long delay. It ran from 1909, when the application was filed, until 1939 when this suit was commenced. Most of it was caused by the plaintiff. The record conclusively shows that all of the delay during the first seven years was in the government offices. It also shows that the delay between 1922 and 1927 was on the plaintiff's side. I can judicially notice the fact that in 1932 the plans for the construction of Grand Coulee Dam had proceeded to such a point in Congress that had the dam been constructed by the defendant subsequent to that year, plaintiff would have good grounds to argue that it should not be reimbursed for the dam because it knew it was going to be flooded anyway. No responsibility can be placed upon the defendant from the years 1933 to 1939 inclusive. So that, of the 30 years' delay, approximately 20 years was caused exclusively by the plaintiff. I am not critical of that delay. It shows the care with which the Interior Department handled the transaction. No snap judgments were taken and nothing unstudied was rushed through. As to the remaining 10 years, consideration must be taken of the fact that, within a few months after the 1916 grant, the United States was at war. There did not exist then the awareness of the possibilities of the development and use of cheap electric power in the Pacific Northwest in defense industries such as exists today. There was no R. F. C. during that war which would build aluminum plants and similar industries to make use of such power. It was a practical impossibility for the defendant to

proceed. The record discloses that as soon as the war conditions had adjusted themselves in 1921, defendant commenced its effort which finally culminated in the corrective grant of 1927. There is no question but that defendant could have and should have commenced construction between 1927 and November, 1929. For that delay, it is solely responsible. No one can seriously argue that this defendant or any other corporation could have financed construction of a dam and power house between November, 1929 and 1933. I review the history of the delay chiefly for the purpose of pointing out again the reason why a separate action in the nature of an equity action was necessary before title would revert to the Government. The trial of a condemnation case is neither the time nor the place to consider questions such as the one I have just discussed. Who is responsible for the delay is immaterial in this case. At any time during these years if the Secretary of the Interior had thought it desirable, plaintiff might have commenced an action to set aside defendant's grant. Having failed, plaintiff cannot use this proceeding as the vehicle for destroying defendant's property right and recapturing title in itself.

 I am frank to state that I do not approve of the Act of March 3, 1905. I think the various Secretaries of the Interior should have exercised the discretion granted to them in that Act and have declined defendant's application as did the Secretary in 1911. I am opposed to the policy of all Acts of a similar nature. However, one cannot read the decisions of the Supreme Court in the last few years without fully concluding that it is the conviction of that Court that courts should not interfere in the operation of Government just because the particular judge of the court disapproves of the policy of the Government. Given the constitutional power to act, Congress is supreme in its legislative field. When Congress, in the exercise of its legislative judgment, delegates to an executive certain powers subject to the standards provided in the Act, that executive is supreme in the delegated field. It does not lie with the courts to interfere just because they dislike what was done. The test of the correctness of the doctrine and its permanence comes when the Court is compelled to accept it to uphold acts of the Congress or of the executive of which the judge disapproves. Here we have a case where, within its constitutional power, the Congress plainly delegated to the Secretary of the Interior the power to grant certain rights to this defendant. The Secretary, in strict conformity with the terms of the power delegated to him, made the grants to the defendant. Relying thereon, defendant expended large sums of money. It is entitled to have the jury pass upon the value of that which it acquired. I will submit the question of power site damages to the jury.